*1094
 
 OPINION
 

 Per Curiam:
 

 At trial, the state presented evidence that appellant David Stephen Middleton committed murder on two separate occasions, in each case abducting a woman from her home, holding her captive in a leased storage unit, killing her, and then dumping her body. Middleton appeals, contending among other things that there was insufficient evidence to convict him and that trial on the counts relating to each victim should have been severed. We conclude that Middleton’s contentions lack merit and therefore affirm.
 

 FACTS
 

 The discovery of Katherine Powell’s body and resulting investigation
 

 At around 9:30 p.m. on the night of February 11, 1995, a woman’s body was found in a trash dumpster at a Reno apartment complex. The body was in a sleeping bag and covered by plastic garbage bags. A large yellow plastic bag covered the sleeping bag. The body was taken to the coroner’s office. From its fingerprints the body was later identified as that of Katherine Powell.
 

 Dr. Roger Ritzlin performed the autopsy on Powell’s body. Her body was loosely bound by rope and, aside from a black tank top and blue socks, was naked. It exhibited bruises, particularly on the elbows and knees; most of the bruises were incurred prior to death. Powell had likely been dead for at least two days. There were blue fibers on her body. A nontoxic amount of lithium was in her blood. (Powell had been prescribed lithium for a bipolar disorder.) Microscopic analysis of sections of the left ventricle of her heart exhibited some fibrosis and acute cell death; the latter occurred a few days before death. Ritzlin found no petechiae (small hemorrhages) or any fecal staining. At trial, he testified that after death by suffocation, petechiae are usually seen and fecal staining is often seen. Ritzlin could not determine the cause of death, but suffocation or cardiac arrhythmia were possible causes. Bite marks were later found on Powell’s body, and a semen stain was found on her right thigh.
 

 At the time of her death, Powell was forty-five years old, divorced, and living alone in Reno. She had a Ph.D. in psychology and taught third grade at Sun Valley Elementary School. She was last heard from or seen alive on the evening of Friday, February 3, 1995. Powell had a ski trip with a friend planned for the next morning, but she failed to show. Various friends
 
 *1095
 
 attempted to contact her over the weekend, and she failed to appear at work on Monday, February 6, although she was known to be extremely reliable. A school custodian went to her home and knocked, but got no response; he noticed an attempted service tag from TCI Cable on the door, dated Saturday, February 4. Later on Monday, two other school employees went to Powell’s home, looked through a window and saw what they thought could be a foot on the unmade bed, and called 911. Police arrived and entered the home. The bed was rumpled, but they saw nothing that made them suspicious at that time.
 

 After Powell’s body was found on February 11, 1995, police learned the following information. Two of Powell’s neighbors, Angela Green and Charles Corning, noticed a pickup truck parked in front of Powell’s home early in the morning on Saturday, February 4. Green noticed that the pickup was loaded up with “home items” and had out-of-state plates; when she was later shown a photograph of a pickup owned by Middleton, she said “that could well be the truck.” Corning said that the pickup was red, and when shown the photo of Middleton’s pickup, he said “that looks like the truck.” A third neighbor noticed on Wednesday, February 1, that a TCI Cable truck was parked in front of Powell’s home. This neighbor later identified the occupants as Middleton and Evonne Haley. (Haley lived with Middleton.)
 

 Two of Powell’s friends, Gerald Brown and Candace Kelly, returned from a trip on Sunday, February 5, and went to pick up Kelly’s dog, which Powell had been keeping for them. Powell was not home, but they had a key, entered, and got the dog. The next day, Brown heard that Powell had not gone to work so he went back to her home and noticed various items were missing, including a phone, a camera, a FAX machine, a laptop computer, and a laser printer. In the kitchen he found a couple of condoms and a wad of duct tape.
 

 On Sunday, February 5, a person telephoned the Good Guys store in Reno and ordered a $1,900 piece of stereo equipment, using Powell’s credit card. Gary Cable, the employee who took the call, said that the caller’s voice was husky and he could not tell if the caller was a man or woman. Mark Decker, Cable’s manager, approved the transaction. Decker received a telephone call regarding the purchase on Monday morning. He believed the caller was male. The caller said he would send a courier to pick up the equipment. On Monday afternoon, a woman arrived at the store with a red handtruck and picked up the equipment. Store employees later identified the woman as Haley. One employee’s description of the truck she drove led police to Middleton’s pickup, an early 1970s, red International Harvester with Colorado license plates.
 

 
 *1096
 
 Reno police detective Steven Reed determined that Middleton was the TCI Cable technician who had made a service call at Powell’s home on January 28, 1995. The detective took Powell’s neighbor, Corning, to Middleton’s workplace to view Middleton’s pickup. Corning believed that the pickup was likely the same one he had seen at Powell’s.
 

 Detective David Jenkins determined that the brand of yellow plastic bag covering the sleeping bag which held Powell’s body was sold at only two hardware stores in Reno. Only one store, Commercial Hardware in downtown Reno, had recently sold the yellow bags. They were sold on Wednesday, February 8, along with a box of 33-gallon garbage bags.
 

 On February 23, 1995, Detective Jenkins interviewed Middleton, who was not in custody. Middleton admitted that he had made a service call to Powell’s home on January 28, 1995, and that he owned a red, 1972 International Harvester pickup. However, he denied knowing anything about the purchase of stereo equipment at the Good Guys store or about Powell’s credit card. When asked about the purchase of plastic bags at Commercial Hardware, Middleton initially said he did not know where the store was, but then said he had shopped there five or six times but not recently. When asked if he had shopped there on February 8, he was equivocal — saying that if he was on video, then he had — and he was unsure whether he had bought any garbage bags. Although Jenkins had said nothing about Powell’s death, Middleton said that it seemed like Jenkins was trying to tie Middleton to her murder. Jenkins asked if Middleton had a storage unit, and Middleton said no. The interview ended when Middleton said that he wanted to leave.
 

 On March 4, 1995, an anonymous caller informed police that Middleton and Haley had a storage unit. The next day, police searched the unit pursuant to a warrant. They found the stereo equipment purchased from the Good Guys and a box of yellow plastic bags and a box of garbage bags, both with Commercial Hardware price tags. One of three yellow bags was missing from the first box, as were some garbage bags from the second. Also in the unit were Powell’s house and car keys, camera, computer, printer, and other personal property. A refrigerator was lying on its back on the floor of the unit. In it were blue fibers similar to fibers found on Powell’s body. The refrigerator was modified: its shelves were removed, the floor of its freezer compartment was cut and folded down to make one space, and two air holes were drilled in it. Police also found a switchblade knife, a stun gun, a foam ball with apparent teeth marks, and rope similar to that used to bind Powell’s body. Other evidence collected included: orange-handled tension clamps; hair and fiber from one of the clamps;
 
 *1097
 
 black canvas belts with velcro; black wire ties; handcuffs; condoms; partial rolls of duct tape; a large speaker box with a space behind the speaker about 14 inches deep, 30 inches wide, and 36 inches high; hairs and fibers from the speaker box; several blankets; and chains. Pursuant to a seizure order, police obtained a mold of Middleton’s teeth to compare to the bite marks found on Powell’s body. Dr. Raymond Rawson, a professor in dentistry, concluded that the bite mark on Powell’s left breast was inflicted while she was still alive, that it was a hard and painful bite causing bleeding below the skin, and that Middleton inflicted it.
 

 The discovery of Thelma Davila’s remains and resulting investigation
 

 On April 9, 1995, about two months after the discovery of Powell’s body, a man walking with his dog in a secluded area near Verdi found a human skull and other skeletal remains and notified police. From August through October 1994, another Verdi resident had smelled a foul odor in the area where the remains were later found. In late September or early October 1994, he saw remnants of a sleeping bag in that area. Donald Means of the Washoe County Sheriff’s Office performed forensic investigation of the remains. He noted “a lot of animal activity” and “trash bags, bones, and bone fragments strewn several hundred yards.” A matted hairpiece was found with rope in it; the rope was the same diameter as the rope found with Powell’s body. Means had also investigated Powell’s death, and finding two “body dumps” “with trash bags and rope” in such a short period of time was unusual in Means’s experience.
 

 A dental bridge in the skull led to the identification of the remains as those of Thelma Davila. Dr. Frederick Laubscher performed a “medical examination” of the remains. (An “autopsy” was not possible because of the lack of tissue.) He examined the remains for evidence of the cause of death, but the skull was intact, and none of the other bones exhibited evidence of a gunshot or knife wound, crushing injury, or traumatic injury of any sort. Because the remains were so incomplete, Laubscher was unable to determine a cause of death. He could not rule out suffocation or most other possible causes of death.
 

 The police learned that Davila had disappeared in August 1994. At that time she was forty-two years old and shared a one-bedroom apartment in Sparks with her sister, Dora Valverde. She had worked her usual evening shift at the Hickory Pit restaurant in Circus Circus in Reno on Sunday, August 7, 1994. She failed to show for work the next day even though she had not missed a single day in more than six years of employment at the restaurant. She also failed to show up for a dental appointment that day.
 

 
 *1098
 
 Valverde last saw her sister around 8:00 a.m. on Monday, August 8, 1994. When Valverde left for work, Davila was sleeping on the couch in the living room. When Valverde returned to the apartment that evening, the door was not locked, and a plant by the couch had been knocked onto the floor. She and one of Davila’s friends later identified a blanket, a black lacy top, and a red hair tie found in Middleton’s storage unit as Davila’s. On Wednesday, August 10, 1994, Valverde reported her sister missing.
 

 Davila occasionally went with a friend to Cheers, a Latin dance club in downtown Reno. The two went to Cheers on the night of Saturday, August 6, 1994. The friend testified that Davila had a preference for black men. (Middleton is African-American.) Another friend testified that when he visited Davila and Valverde, they always looked out their window at him before opening the door. The former owner of Cheers saw Middleton one night using the pay phone at Cheers sometime in the latter part of 1994. Two employees of the Hickory Pit restaurant remembered seeing Haley in the restaurant. One saw her there two or three times in June and July of 1994, usually with a black man. The other saw her there just a day or two before Davila disappeared. A third employee saw Davila and Haley together in 1994 on three occasions: at the restaurant, at a grocery store, and at a medical complex.
 

 A Citifare bus driver knew Davila because she was a regular passenger on his route for many years. The driver saw Davila on the afternoon of Friday, August 5, 1994, at the Sparks bus station. Davila was quite dressed up and told him her friends were picking her up to go out to dinner. A white or beige pickup truck pulled up. In the truck were a woman with curly, reddish blond hair and a black man. The man stepped out, Davila jumped into the truck and sat in the middle, and the truck drove off.
 

 TCI Cable had been installed in the sisters’ apartment in June 1993 and serviced in July 1994, but Middleton performed neither service. Middleton did not work on Monday, August 8, 1994, the day Davila disappeared. Around 6:45 a.m. that same day, a neighbor of Davila and Valverde saw Middleton walk partway up the stairs leading to Davila’s apartment and then come back down.
 

 Other evidence presented at trial
 

 Middleton first leased a storage unit in Sparks on June 30, 1994, under the name of Hal Data Research. This unit was five feet by ten feet in size. On the afternoon of August 8, 1994 — the day that Davila was last seen alive — Middleton leased a unit which was ten feet by ten feet and moved out of the smaller unit. Tenants entered the storage unit facility using a computer code at the front
 
 *1099
 
 gate, and records were kept of the entries. On Friday, February 3, 1995 — the last day that Powell was seen alive — Middleton entered the facility at 2:13 a.m. and 8:06 p.m. For Saturday, February 4, the log showed entries by Middleton at 12:37 a.m., 5:47 a.m., 6:49 a.m., 8:45 a.m., 11:53 a.m., and 5:38 p.m. On Sunday, February 5, he entered the facility at 6:19 a.m., 11:09 a.m., and 3:30 p.m., and on Monday, February 6, he entered at 9:26 a.m. and 3:15 p.m. There were no entries for Tuesday, February 7; one entry at 6:49 p.m. on Wednesday, February 8; no entries on Thursday, February 9; and one entry on Friday, February' 10, at 7:45 p.m. The log showed one entry on Saturday, February 11, at 7:26 p.m. Powell’s body was found around 9:30 p.m. that same night. Middleton entered the facility again at 12:53 a.m. on Sunday, February 12, 1995.
 

 On June 7, 1995, at Middleton’s request Detective Jenkins again interviewed Middleton. Jenkins asked questions regarding Davila. Middleton said he had been to Davila’s apartment complex but did not know her. He denied that Davila’s blanket could be in his storage unit. He said that he had moved from one storage unit to another on August 8, 1994. Middleton told Jenkins that Haley had never been to the storage unit and did not know about it. Jenkins spoke with Middleton again on June 20, 1995. Middleton continued to deny knowing Davila or having her blanket.
 

 Forensic analysis showed that fibers found in the refrigerator in Middleton’s storage unit were indistinguishable from those found on Powell’s body: both were cotton and blue-green in color. Two human head hairs found in the refrigerator and one found on a black restraint belt could have come from Powell. Rope found in Middleton’s storage unit, the rope found around Powell’s body, and the rope found with Davila’s remains were all white, nylon, woven twelve-strand, and one-quarter inch in diameter. Analysis revealed no difference between the ropes; however, the rope was a common type. Five hairs found on a roll of duct tape and two hairs found on two blankets in the storage unit were consistent with those obtained from Davila’s hairbrush. An expert in knot analysis testified that the ropes found with the remains of both Powell and Davila contained “SS granny knots,” but the granny knot is a very common knot.
 

 DNA analysis was also performed on various pieces of evidence. Cellular material was obtained from the foam ball found in the storage unit. DNA analysis of that material showed that it matched Powell’s DNA; the match was rarer than one in 100 million people. The roots of various hairs found in the storage unit were tested. The DNA from two hairs found in a clamp and one
 
 *1100
 
 hair on a blanket matched Powell’s DNA; the match was about one in every 780,000 Caucasians. The DNA from one hair found on duct tape and one hair from another blanket matched Davila’s DNA; the match was one in 690,000 among Hispanics. DNA obtained from a semen stain on the right thigh of Powell was consistent with Middleton’s DNA and that of about one of every 100 African-Americans.
 

 At trial the state offered expert testimony that based on the volume of the refrigerator and the size of the two holes drilled in it, a person weighing 145 pounds enclosed in the refrigerator would have died from oxygen deprivation in about three and a half hours.
 

 Dr. Vincent Di Maio, a chief medical examiner in Texas, testified for the state to the following. Despite mild perivascular fibrosis, Powell’s heart was healthy and normal. Although a person should have an EKG when she first begins taking lithium, studies in the 1990s showed that long-term users of lithium did not die from heart disease at a rate greater than the general population. The circumstances of Powell’s disappearance and her body when found indicated that her death was a homicide. The lack of pathological findings indicated that she probably died of asphyxiation. The bruises on her elbows and knees were consistent with struggles to free herself from a confined space, such as the refrigerator. Petechiae were found in only about thirteen percent of suffocation homicides handled by Di Maio’s office. The circumstances surrounding Davila’s disappearance and skeletal remains also indicated that her death was a homicide, but the cause of death could not be determined.
 

 The defense presented the testimony of two physicians. Dr. Robert Bucklin, a deputy medical examiner for Clark County, stated that Powell suffered from heart disease, but he did not know if it caused her death. He did not believe that she died from asphyxiation. Dr. Jerry Howie, a psychiatrist, testified that taking lithium could cause cardiac arrhythmia and carried some risk of sudden death, but he did not know what effect it had on Powell.
 

 Outside the presence of the jury, the district court asked Middleton if he wished to testify. Middleton said that he wanted to “testify on the Davila case part of it. But I guess I can’t because the cases are joined. I cannot testify on one without looking bad on the other one. So I guess I can’t testify.”
 

 The jury found Middleton guilty of two counts of first-degree murder, two counts of first-degree kidnapping, one count of grand larceny, and one count of fraudulent use of a credit card. At a bench trial the next month, the district court found him guilty of two counts of ex-felon in possession of a firearm.
 

 
 *1101
 

 The penalty phase
 

 At the penalty hearing, outside the presence of the jury, the defense moved to preclude evidence that Middleton had been charged with sexual assault and kidnapping in Florida in 1990. The Florida case resulted in conviction of one count of aggravated battery and one count of false imprisonment. The prosecutor, Thomas Viloria, proposed to call as a witness the victim of the Florida crimes, who was sixteen years old at the time of the crimes. The district court ruled that the conviction was admissible, but stated, “I’m not going to allow testimony concerning sexual assault in the state’s case in chief. However, I warn counsel that any explanation of this conviction ... is going to open up the door to Mr. Viloria’s ability to explain what he perceives as the facts in this case.”
 

 Defense counsel also voiced concern that members of Powell’s family testifying as victims might call for the death penalty. Viloria stated that he would instruct the victims not to ask for the death penalty, but argued that they could ask for “the maximum sentence.” He further argued that if defense witnesses asked for a penalty less than death, then in rebuttal the state could recall victims to ask for death. The district court asked Viloria if he had authority for that. This prompted a lengthy tirade by Viloria in which he stated, among other things, that “the rights of the defendant outside the Constitution have wallowed [sic] the Constitution, making it meaningless. I would submit that it is just but that, an old rag that needs to be modified. It has no meaning.” The district court eventually ruled that victims could request neither the death penalty nor “the maximum penalty.”
 

 Middleton’s stepmother testified for him. Toward the end of direct examination, defense counsel asked her, “And did you know he got in trouble in Miami?” She answered, “Yes.” On cross-examination, Viloria asked, “You are aware, ma’am, that he took a sixteen-year-old woman to a remote area, kept her in his car, and engaged in sexual activity with her?” Defense counsel objected and moved for a mistrial, and the district court excused the jury. The court asked Viloria, “Why now, Mr. Viloria? . . . Why now without my advance permission?” Viloria argued that the defense had opened the door to his question, but the court rejected that argument. The court even said, “I’m questioning your motives here,” and ruled, “You are precluded from bringing up any evidence concerning any criminal activity in the rest of your case. You are precluded from asking any questions, any further questions of this witness, and you’ll pack this to the Ninth Circuit on your back.” When the jurors returned, the court admonished them that Middleton’s prior conviction did not relate
 
 *1102
 
 to sexual activity and asked if anyone would have trouble disregarding Viloria’s question. No jurors indicated that they would.
 

 The defense also called Susan McCurdy, Executive Secretary of the Parole and Pardons Board. Counsel asked if Middleton were sentenced to life imprisonment without the possibility of parole under NRS 213.085, “could that sentence ever be commuted to parole?” She said, “No, it cannot.” Viloria then cross-examined.
 

 Q Ma’am, that assumes that the legislature doesn’t decide to change the law the next session or the next session after that or the next session after that, doesn’t it?
 

 A That is correct.
 

 Q They are always free to change the law as they do every other year?
 

 A That is correct.
 

 Q So there will be no guarantee that life without won’t be subjected to legislative change down the road?
 

 A There is no guarantee.
 

 The defense made no objection.
 

 For Davila’s murder, the jury found four aggravators: Middleton had two previous convictions for felonies involving the use or threat of violence, the murder was committed in the commission of or attempt to commit first-degree kidnapping, and Middleton was convicted of more than one murder in this proceeding. The jury found the same four aggravating circumstances in Powell’s murder and a fifth: the murder involved torture and/or depravity of mind. For both murders, the jury found no mitigating circumstances sufficient to outweigh the aggravators and sentenced Middleton to death.
 

 For the two counts of first-degree kidnapping, one count of grand larceny, one count of fraudulent use of a credit card, and two counts of ex-felon in possession of a firearm, the district court sentenced Middleton to the following consecutive prison terms: life without possibility of parole, life without possibility of parole, ten years, ten years, six years, and six years.
 

 DISCUSSION
 

 There was sufficient evidence that appellant committed the murders, kidnappings, and fraudulent use of a credit card
 

 In reviewing the evidence supporting a jury’s verdict, this court must determine whether the jury, acting reasonably, could have been convinced of the defendant’s guilt by the competent evidence beyond a reasonable doubt. Wilkins v. State, 96 Nev. 367, 374, 609 P.2d 309, 313 (1980). Where conflicting testimony is pre
 
 *1103
 
 sented, the jury determines what weight and credibility to give it. Bolden v. State, 97 Nev. 71, 624 P.2d 20 (1981). The relevant inquiry for this court is “ ‘whether, after viewing the evidence in the light most favorable to the prosecution,
 
 any
 
 rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.’” Koza v. State, 100 Nev. 245, 250, 681 P.2d 44, 47 (1984) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).
 

 Evidence of criminal agency in the deaths
 

 Middleton contends first that the state failed to prove that the victims’ deaths resulted from criminal agency, a necessary element to establish the corpus delicti of murder. He points to the evidence that Powell suffered from heart disease; that she was taking lithium, which is associated with cardiac problems; and that her cause of death could not be determined. Likewise, he stresses that Davila’s cause of death was not determined. Middleton cites Frutiger v. State, 111 Nev. 1385, 907 P.2d 158 (1995), where this court concluded that there was insufficient evidence that an alleged victim’s death was caused by the criminal agency of another. Middleton does not, however, discuss the circumstances surrounding the disappearance of the victims and discovery of their remains or the evidence found in his storage unit.
 

 In deciding a sheriff’s appeal in this case in 1996, we considered this same argument in regard to the sufficiency of the evidence to bind Middleton over for trial. Sheriff v. Middleton, 112 Nev. 956, 921 P.2d 282 (1996). We held: “Although medical evidence as to the cause of death is often critical in establishing that a death occurred by criminal agency, there is no requirement that there be evidence of a specific cause of death.”
 
 Id.
 
 at 962, 921 P.2d at 286. We reversed the district court’s order granting Middleton’s pretrial petition for a writ of habeas corpus. The district court had limited its review
 

 to evidence of the bare conditions of the bodies themselves, and found that the bodies alone did not reveal death by criminal agency because they did not reveal anything, and therefore the state had not met its burden. This conclusion is not mandated by our decision in
 
 Frutiger.
 
 The court must consider and weigh all the evidence offered which bears on the question of death by criminal agency. In this case, the circumstances of the disappearances of the women, the discoveries of their bodies in remote locations, tied with rope, wrapped in garbage bags, bitten severely, clearly creates a reasonable inference of their deaths by criminal agency.
 
 *1104
 
 Furthermore, unlike in
 
 Frutiger,
 
 where the weight of the available medical evidence indicated a likelihood of death by natural causes, in this case there is no evidence to rebut the inference of death by criminal agency. The district court erred in not considering at least the circumstances of the disappearances of the women and the discoveries of their bodies. There is ample evidence by those circumstances alone tending to prove that Powell and Davila died by a criminal agency.
 

 Id.
 
 at 964, 921 P.2d at 287.
 

 This analysis is still dispositive, even allowing for the requirement that at trial criminal agency had to be proved beyond a reasonable doubt.
 
 Id.
 
 The evidence showed that Powell’s heart was basically healthy and that the amount of lithium in her system was not life threatening. There was no evidence that Davila suffered from ill health. Thus, unlike
 
 Frutiger,
 
 the record does not show a likelihood of death by natural causes. Furthermore, in deciding the sheriff’s appeal, we did not discuss the evidence which indicated that Middleton took Powell and Davila to his storage unit, where he kept them captive. This evidence further supports the jury’s finding that the deaths resulted from criminal agency.
 

 Evidence that the victims were abducted alive
 

 “Kidnapping requires the willful seizing, confining, or carrying away of a live person.’’ Ducksworth v. State, 113 Nev. 780, 793, 942 P.2d 157, 166 (1997),
 
 reh’g denied,
 
 114 Nev. 951, 966 P.2d 165 (1998). Middleton claims that there was no evidence as to where or how the victims died and therefore that the state failed to prove that the victims were seized alive and against their will. For example, in his brief to this court Middleton says: “The reasonable inference is that Powell died in her house (of unknown causes), her bare body was on the bed and that later her body was taken from the house in a sleeping bag and placed in the refrigerator.’’ The jury obviously did not consider this inference reasonable, nor do we.
 

 Most of the bruising on Powell’s knees and elbows occurred prior to her death and is evidence that she was alive and struggling while trapped in the refrigerator. The foam ball found in the storage unit had tooth marks and Powell’s DNA, indicating that it was used to gag her while she was still alive. The bite mark on Powell’s breast was also inflicted while she was still alive, supporting the theory that Middleton held Powell captive and then killed her.
 

 
 *1105
 
 As to Davila’s kidnapping, no direct evidence shows that Davila was alive and held against her will. Davila’s hair, apparel, and blanket were found in Middleton’s storage unit, but this evidence alone does not indicate whether Davila was alive at that time. Nevertheless, the circumstantial evidence allows no other reasonable conclusion: Middleton moved to the larger storage unit the day that Davila disappeared, and the items found in the unit — the refrigerator with air holes, the gag, and restraint devices — show that he was using it to hold live victims; the condition of Powell’s body also shows this.
 
 [1]
 
 The jury has the right to make logical inferences which flow from the evidence. Hern v. State, 97 Nev. 529, 531, 635 P.2d 278, 279 (1981). The jury, acting reasonably, could have been convinced beyond a reasonable doubt that Middleton kidnapped Davila.
 

 Evidence of appellant’s fraudulent use of a credit card
 

 Middleton unsuccessfully moved the district court to instruct the jury to acquit him of both counts of kidnapping, the count of murdering Davila, and the count of fraudulent use of a credit card. He argues that the court abused its discretion in denying the motion.
 

 The granting of an advisory instruction to acquit rests within the sound discretion of the district court. NRS 175.381(1); Milton v. State, 111 Nev. 1487, 1493, 908 P.2d 684, 688 (1995). As discussed above, there was sufficient evidence to convict Middleton of the murder and kidnapping counts, so the district court did not abuse its discretion in denying the motion in regard to the kidnappings and Davila’s murder.
 
 [2]
 

 The state charged Middleton with fraudulent use of Powell’s credit card at the Good Guys store. Because Haley picked up the stereo equipment from Good Guys and the state failed to allege
 
 *1106
 
 that Middleton aided and abetted Haley,
 
 [3]
 
 Middleton maintains that there was insufficient evidence to convict him of this crime.
 

 We conclude that there was sufficient evidence that Middleton personally committed fraudulent use of the credit card. Mark Decker, a manager at the Good Guys store, took a telephone call on the morning of February 6, 1995, in regard to the purchase on Powell’s credit card. Decker believed that the caller was male. The caller told Decker that he would send a courier to pick up the equipment. Combined with Middleton’s connection to Haley and the presence of the equipment in his storage unit, this was sufficient evidence for the jury to find that Middleton made the call and directly participated in fraudulent use of the credit card.
 

 The district court did not err in refusing to sever the counts relating to each victim from the counts relating to the other
 

 Before trial, Middleton moved to sever the counts relating to Davila from the counts relating to Powell. The district court denied the motion (but severed the two counts charging Middleton with being an ex-felon in possession of a firearm). Middleton says that joinder of the charges was improper because the offenses were unconnected and the joinder prejudiced him.
 

 Middleton cites Drew v. United States, 331 F.2d 85, 88 (D.C. Cir. 1964), for the proposition that joinder may prejudice a defendant because
 

 the jury may cumulate the evidence of the various crimes charged and find guilt when, if considered separately, it would not so find. A less tangible, but perhaps equally persuasive, element of prejudice may reside in a latent feeling of hostility engendered by the charging of several crimes as distinct from only one.
 

 Because the jury convicted him of the murders and kidnappings despite the alleged lack of sufficient evidence, Middleton maintains that his conviction of the four crimes shows that joinder engendered a feeling of hostility toward him among the jurors and led them to cumulate the evidence of the various crimes and find guilt when they otherwise might not have.
 

 NRS 173.115 provides:
 

 Two or more offenses may be charged in the same indictment or information in a separate count for each offense if
 
 *1107
 
 the offenses charged, whether felonies or misdemeanors or both, are:
 

 1. Based on the same act or transaction; or
 

 2. Based on two or more acts or transactions connected together or constituting parts of a common scheme or plan.
 

 Here, joinder was proper under NRS 173.115(2) because the acts charged constituted parts of a common scheme or plan on Middleton’s part to meet women, abduct and hold them captive, abuse and kill them, and then dispose of their bodies. The similarities between the crimes against Davila and Powell include: both victims were unmarried females of similar age (one was forty-two and the other forty-five); both were alone at home when they disappeared; both homes had been serviced by Middleton’s employer, TCI Cable; Middleton had met both victims before their disappearance (the evidence that Middleton met Davila is not conclusive, but strong); neither victim’s home showed evidence of a forced entry; Middleton went to his storage unit on the day that each victim disappeared; his storage unit yielded DNA evidence from each of the victims and property belonging to each; and the remains of each victim were found dumped in remote or concealed locations, wrapped in plastic garbage bags and bound with rope similar to rope found in Middleton’s storage unit.
 

 NRS 174.165(1) provides:
 

 If it appears that a defendant or the State of Nevada is prejudiced by a joinder of offenses or of defendants in an indictment or information, or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.
 

 Thus, even if joinder is permissible under NRS 173.115, the trial court should sever the offenses if the joinder is unfairly prejudicial, i.e., required by justice.
 
 Cf.
 
 Amen v. State, 106 Nev. 749, 755-56, 801 P.2d 1354, 1358-59 (1990) (although joinder of charges against multiple defendants was proper under NRS 173.135, court considered whether joinder prejudiced defendants and required severance under NRS 174.165);
 
 Drew,
 
 331 F.2d at 87 (“[Ejven though joinder is permissible under Rule 8(a), if'the defendant makes a timely motion under Rule 14[
 
 4
 
 ] and shows prejudice, the court should either order an election by the Government or grant separate trials.”).
 

 
 *1108
 
 The decision to sever is left to the discretion of the trial court, and an appellant has the “heavy burden” of showing that the court abused its discretion.
 
 Amen,
 
 106 Nev. at 756, 801 P.2d at 1359. To establish that joinder was prejudicial “requires more than a mere showing that severance might have made acquittal more likely.” United States v. Wilson, 715 F.2d 1164, 1171 (7th Cir. 1983). Misjoinder requires reversal only if the error has a substantial and injurious effect on the jury’s verdict. Mitchell v. State, 105 Nev. 735, 739, 782 P.2d 1340, 1343 (1989).
 

 Middleton has not shown that he was unfairly prejudiced by the joinder of charges. First, as discussed above, we reject his contention that his conviction of the murders and kidnappings was based on insufficient evidence. Second, we conclude that the evidence of the kidnapping and murder of each victim was cross-admissible to prove Middleton’s identity, method, intent, and absence of mistake or accident in regard to the kidnapping and murder of the other. “If . . . evidence of one charge would be cross-admissible in evidence at a separate trial on another charge, then both charges may be tried together and need not be severed.”
 
 Mitchell,
 
 105 Nev. at 738, 782 P.2d at 1342. Evidence of collateral offenses is not admissible to show that a defendant has the propensity to commit crime. Keeney v. State, 109 Nev. 220, 228, 850 P.2d 311, 316 (1993). However, such evidence may be admissible “for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.” NRS 48.045(2). To admit such evidence, the trial court must determine that it is relevant for a permissible purpose, that it is proven by clear and convincing evidence, and that its probative value is not substantially outweighed by the danger of unfair prejudice. Tinch v. State, 113 Nev. 1170, 1176, 946 P.2d 1061, 1064-65 (1997). Applying this test, we conclude that the evidence of each murder and kidnapping would have been admissible at a trial on the other murder and kidnapping.
 

 Middleton asserts another ground for prejudice. He declared at trial that he wanted to testify in regard to “the Davila case” but could not “without looking bad on the other one.” Therefore, he now claims that joinder confounded his ability to present separate defenses.
 
 See Drew,
 
 331 F.2d at 88 (joinder of offenses is prejudicial if it causes a defendant to “become embarrassed or confounded in presenting separate defenses”). This claim remains completely conclusory and unpersuasive: Middleton fails to specify what his defense to the charges involving Davila was, let alone
 
 *1109
 
 how it was inconsistent with or harmful to his defense to the charges involving Powell.
 
 See
 
 People v. Lane, 436 N.E.2d 456, 459-60 (N.Y. 1982) (a defendant seeking to sever counts must make a convincing showing that he has important testimony to give concerning one count and strong need to refrain from testifying on the other; the defendant must present enough information regarding the testimony he wishes to give on one count and his reasons for not wishing to testify on the other to satisfy the court that the claim of prejudice is genuine and to enable it to intelligently weigh the consideration of judicial economy against the defendant’s interests).
 

 The district court did not err in denying the motion to sever.
 

 Appellant’s right to a speedy trial was not violated
 

 Asserting that his right to a speedy trial had been violated, Middleton moved to dismiss all charges on April 22, 1997. His trial began less than four months later, on August 11, 1997. Middleton raises this issue again on appeal, alleging that the state’s “pattern of disclosure and the timing of that disclosure caused [him] to wait 30 months before enjoying his right to trial.” He also questions the state’s motives in successfully moving before trial to disqualify the public defender from representing him.
 

 It is not clear when Middleton was first arrested on the charges in this case. He says that it was February 23, 1995. The state claims that this arrest was for being an ex-felon in possession of a firearm and that on May 17, 1995, Middleton pled guilty to conspiracy to commit the crime of ex-felon in possession of a firearm and received a one-year jail sentence. The record contains a copy of a plea memorandum which bears out the state’s claim. The parties agree that Middleton was first formally charged in this case on June 22, 1995. Middleton’s trial began on August 11, 1997. From February 23, 1995, to August 11, 1997, is a period of slightly less than thirty months. From June 22, 1995, to August 11, 1997, is a period of less than twenty-six months. Even assuming that the relevant delay was the longer period, we conclude that Middleton’s right to a speedy trial was not violated.
 

 A number of Middleton’s own actions contributed to the delay of his trial. These include, for example, a petition for a writ of habeas corpus, a motion to reconsider that petition after its denial, a motion to sever, and a motion to dismiss or alternatively to suppress. The district court granted Middleton’s pretrial habeas petition, leading to a sheriff’s appeal, which in turn resulted in reversal and remand by this court. Middleton does not mention,
 
 *1110
 
 let alone address, the part that these or other of his own actions played in delaying the trial.
 

 A court must conduct a balancing test to determine if a defendant’s Sixth Amendment right to a speedy trial was violated. Barker v. Wingo, 407 U.S. 514, 530 (1972). The court should consider the length of delay, the reason for the delay, the defendant’s assertion of his right, and prejudice to the defendant.
 
 Id.
 
 Unless the delay is long enough to be presumptively prejudicial, inquiry into the other factors is not necessary.
 
 Id.
 

 First, we conclude that a delay of almost two and a half years necessitates further inquiry. Second, we conclude that the reason for the delay in this case was much more Middleton’s responsibility than the state’s, given his extensive pretrial litigation, most notably his initially successful habeas petition which led to an appeal and reversal. The district court estimated that the petition was responsible for at least three quarters of the delay. Although a deliberate attempt to delay a trial in order to hamper the defense weighs heavily against the state,
 
 id.
 
 at 531, the district court found that the state had legitimate reason to move to disqualify the public defender: a potential conflict of interest because the public defender was also representing Haley.
 
 [5]
 
 The court also found that the state was not otherwise abusing court procedures to delay the trial. Third, Middleton asserted his speedy trial right, but not until April 1997. Finally, Middleton has not demonstrated that he was prejudiced by the delay. He dispenses with this factor by citing Doggett v. United States, 505 U.S. 647, 655 (1992), for the proposition that “affirmative proof of particularized prejudice is not essential to every speedy trial claim.” However, “such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other
 
 Barker
 
 criteria,” and “its importance increases with the length of delay.”
 
 Id.
 
 at 656. In
 
 Doggett,
 
 the United States Supreme Court concluded that presumptive prejudice resulting from a delay of eight and a half years combined with government negligence violated the Sixth Amendment. The delay in this case of less than two and a half years does not give rise to such presumptive prejudice, especially since Middleton was responsible for most of the delay.
 

 Middleton’s right to a speedy trial was not violated.
 
 *1111
 

 The district court did not err in admitting evidence of statements made by appellant to police
 

 Middleton claims that police failed to advise him of his rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), before subjecting him to custodial interrogations and interrogated him without his attorney’s knowledge or consent. He says that his statements to police were used to obtain search warrants which produced incriminating evidence and that his statements and the evidence should be suppressed. Middleton fails to provide this court with reference to supporting facts in the record. More tellingly, in his opening brief Middleton does not inform us that the district court, after holding an extended hearing on the matter, granted in part his motion to suppress.
 

 The district court ruled from the bench. It found that on February 23, 1995, Middleton’s interrogation was noncustodial up to the point that he asked a police officer to return the keys to his pickup but did not get them back. The court suppressed Middleton’s statements made that day after that point. The court suppressed Middleton's statements made on March 1, 1995, up until the district attorney informed him of his
 
 Miranda
 
 rights. The court found that Middleton’s waiver of those rights was intelligent and voluntary and allowed in his statements until he chose not to continue talking to police on March 3, 1995.
 

 Middleton’s claims on this issue remain conclusory and unsupported by adequate citation to the record. He has utterly failed to carry his burden of demonstrating how the district court’s ruling was erroneous.
 

 The reasonable doubt instruction was not unconstitutional
 

 Middleton claims that the jury instruction on reasonable doubt given at the guilt and penalty phases of his trial was unconstitutional. He concedes that the instruction was the one prescribed by NRS 175.211(1). No other definition of reasonable doubt may be given to a jury. NRS 175.211(2).
 

 This court would prefer that the legislature adopt a different definition which does not describe reasonable doubt as the kind that governs a person in life’s “more weighty affairs.” Bollinger v. State, 111 Nev. 1110, 1115 n.2, 901 P.2d 671, 674 n.2 (1995). Because the legislature has not changed the statute, Middleton asks this court to declare the “more weighty affairs” language unconstitutional. We have no cause to do so. We held that there was no reasonable likelihood that a jury applied this language
 
 *1112
 
 unconstitutionally where the jury was also instructed concerning the presumption of innocence and the state’s burden of proof.
 
 Id.
 
 at 1115, 901 P.2d at 674. The jury in this case was so instructed. We therefore conclude that the instruction did not violate due process.
 
 Cf.
 
 Ramirez v. Hatcher, 136 F.3d 1209, 1211, 1215 (9th Cir. 1998).
 

 Middleton also objects to instructing jurors that if they have an “abiding conviction” of the truth of the charge, there is not a reasonable doubt. He claims that this could mislead jurors to think that the state’s burden of proof was less than beyond a reasonable doubt. This court has already stated that “we do not think the ‘abiding conviction of the truth of the charge’ language dilutes the definition of reasonable doubt or that it reduces the prosecutor’s burden of proof to convict.” Lord v. State, 107 Nev. 28, 40, 806 P.2d 548, 555-56 (1991). We decline to revisit this issue.
 

 Prosecutorial misconduct during the penalty phase did not prejudice appellant
 

 Middleton asserts that three instances of prosecutorial misconduct occurred during the penalty phase. First, he contends that the prosecutor improperly elicited the following remark from Powell’s brother: “I can’t see giving that person any more respect or dignity or mercy than he showed Kathy.” Although a victim can express an opinion regarding the defendant’s sentence only in a noncapital case, this remark is acceptable.
 
 See
 
 Witter v. State, 112 Nev. 908, 922, 921 P.2d 886, 896 (1996).
 

 Second, Middleton argues that reversible misconduct occurred and the district court should have declared a mistrial when Viloria asked Middleton’s stepmother if she was aware that Middleton “took a sixteen-year-old woman to a remote area, kept her in his car, and engaged in sexual activity with her?” Viloria asked this question even though the district court had ruled, after extensive discussion, that the facts of Middleton’s Florida conviction were not admissible as long as the defense offered no explanation of the conviction. The state concedes that it cannot defend Viloria’s question, but nevertheless claims that defense counsel first asked an “explosive question” which “literally invited a response, just not the one the prosecutor exercised.” We disagree. Counsel simply asked, “And did you know he got in trouble in Miami?”, to which the stepmother answered, “Yes.” Neither the question nor the answer in any way constituted an explanation of the conviction justifying Viloria’s question.
 
 [6]
 

 
 *1113
 
 Thus, we must determine whether the district court’s admonishment of the jurors cured the error injected by Viloria’s question. When a jury hears improper evidence of another crime by the defendant, this court’s standard of review depends on whether it is reviewing the guilt or penalty phase of a capital case. Allen v. State, 99 Nev. 485, 490-91, 665 P.2d 238, 241-42 (1983). To establish reversible error at the guilt phase, an appellant must prove that the evidence “was so prejudicial as to be unsuscepti-ble to neutralizing by an admonition to the jury.”
 
 Id.
 
 at 490, 665 P.2d at 241. Where the issue is the validity of a death sentence, the appellant must “demonstrate the possibility that the sentence was influenced by such testimony notwithstanding the court’s admonition to the jury.”
 
 Id.
 
 at 491, 665 P.2d at 242. We add that this must be a reasonable possibility, not an unlikely one.
 

 In making this determination, this court should consider four factors: (1) whether the remark was solicited by the prosecution; (2) whether the district court immediately admonished the jury; (3) whether the statement was clearly and enduringly prejudicial; and (4) whether the evidence of guilt was convincing. Geiger v. State, 112 Nev. 938, 942, 920 P.2d 993, 995-96 (1996). Here, the prosecutor himself, recklessly or deliberately, made the remark. This worsens the error. However, even deliberate misconduct by the prosecutor does not necessarily make the error reversible.
 
 See
 
 Emmons v. State, 107 Nev. 53, 60, 807 P.2d 718, 722-23 (1991). Factor two mitigated the error: the district court immediately informed the jurors that Middleton’s prior conviction did not relate to sexual activity and determined that they would disregard the improper question. Next, we conclude that the remark was somewhat prejudicial, but not enduringly so. It was only one remark in a penalty hearing that lasted more than two days, and Viloria did not say that Middleton had sex with the victim against her will. Factor four relates here to death-worthiness, not guilt. In this case, it also weighs against prejudice. Given that death is an appropriate penalty for the most heinous murders, it is appropri
 
 *1114
 
 ate here where the evidence shows that these victims suffered horrible deaths at the hands of a callous, calculating, sadistic killer.
 

 Given the district court’s timely admonition and the immense evidence of the aggravated nature of the murders, we conclude that Middleton has not demonstrated a reasonable possibility that the error influenced his sentence.
 

 Third, Middleton claims that Viloria improperly cross-examined the Executive Secretary of the Parole and Pardons Board regarding the possibility of the legislature’s changing the statute which prohibits commutation of life sentences without the possibility of parole. However, Middleton did not object below. Therefore, this court should review the claim only if it is plain error, which requires Middleton to show that the cross-examination was patently prejudicial. Riker v. State, 111 Nev. 1316, 1328, 905 P.2d 706, 713 (1995). It was improper for the state to delve into the possibility that a sentence of life imprisonment without parole could be modified. This court formerly required jurors in capital cases to be instructed that “you may not speculate as to whether the sentence you impose may be changed at a later date.’’ Petrocelli v. State, 101 Nev. 46, 56, 692 P.2d 503, 511 (1985). More recently, we directed that all references to modification of sentences be eliminated from capital jury instructions. Sonner v. State, 114 Nev. 321, 326-27, 955 P.2d 673, 677 (1998). However, we conclude that any prejudice caused by the state’s cross-examination was negligible.
 

 The
 
 district•
 
 court did not err in rejecting jury instructions proposed by the defense
 

 Middleton asked the district court at the penalty phase to instruct the jury that it could consider any residual doubt it had regarding his guilt and that “it must find that [Middleton] has no significant history of prior criminal activity and that mitigating circumstance may be enough to defeat all aggravating circumstances and result in a sentence less than death.” He claims that in rejecting the proposed instructions, the court unconstitutionally excluded aspects of mitigation from the jury’s consideration. This claim has no merit.
 

 First, a capital defendant has no constitutional right to a jury instruction making residual doubt a mitigating circumstance. Homick v. State, 108 Nev. 127, 141, 825 P.2d 600, 609 (1992) (citing Franklin v. Lynaugh, 487 U.S. 164 (1988)). Second, a proposed jury instruction must correctly state the law, and even a correct instruction need not be given if it is covered by other
 
 *1115
 
 instructions. Barron v. State, 105 Nev. 767, 773, 783 P.2d 444, 448 (1989). Middleton had two prior felony convictions; thus, he had no right to have the question of fact regarding his prior criminal history decided as a matter of law. Nor was the question excluded from the jury’s consideration. One jury instruction listed possible mitigating circumstances, including “no significant history of prior criminal activity.’ ’ The jury was also instructed that any one mitigating circumstance “may be sufficient, standing alone, to support a decision that death is not the appropriate punishment in this case.’ ’ It was further properly instructed that even absent a finding of any mitigators, it was not required to return a sentence of death but could sentence Middleton to life in prison with or without the possibility of parole.
 

 The aggravating circumstances were valid, and the death penalties are-not excessive in this case
 

 Middleton invokes NRS 177.055(2), which requires this court to review his death sentence and consider:
 

 (a) Any errors enumerated by way of appeal;
 

 (b) Whether the evidence supports the finding of an aggravating circumstance or circumstances;
 

 (c) Whether the sentence of death was imposed under the influence of passion, prejudice or any arbitrary factor; and
 

 (d) Whether the sentence of death is excessive, considering both the crime and the defendant.
 

 Middleton contends first that “the jury’s apparent rejection of any mitigating factor demonstrates’ ’ that his sentence is unreliable and the product of passion and prejudice. The verdict forms indicate that the jury found that “any mitigating circumstance or circumstances are not sufficient to outweigh” the aggravating circumstances. Therefore, it is possible that the jurors found mitigating circumstances existed. But even if they found none, Middleton cites no evidence or authority to demonstrate how that shows the influence of any arbitrary factor.
 

 Next, Middleton challenges the validity of two of the aggravating circumstances. He claims that it was improper to enumerate his two prior Florida offenses as separate aggravators because they stemmed from a single event. This court has held, however, that “if the defendant can be prosecuted for each crime separately, each can be used as an aggravating circumstance.” Riley v. State, 107 Nev. 205, 217, 808 P.2d 551, 558 (1991). Middleton also contends that there was no evidence to support the aggravator of
 
 *1116
 
 torture and depravity of mind
 
 [7]
 
 found in Powell’s murder. We disagree. There was sufficient evidence for the jury to find that Middleton held Powell bound and captive for an extended period of time while he treated her sadistically — the bite on her breast is direct evidence of this while various items found in the storage unit are indirect — and that he finally allowed her to suffocate while she beat her knees and elbows against the sides of the refrigerator in her anguish. We conclude that this evidence supports a finding of torture and depravity of mind.
 

 Pursuant to NRS 177.055(2), we conclude that the evidence supports the finding of the aggravating circumstances, that it does not appear that Middleton’s sentences of death were imposed under the influence of passion, prejudice, or any arbitrary factor, and that the sentences are not excessive, considering both the crime and the defendant.
 

 Nevada’s death penalty statutes are constitutional
 

 Middleton argues that Nevada’s death penalty statutes fail to narrow the class of defendants who are death eligible.
 
 See, e.g.,
 
 Arave v. Creech, 507 U.S. 463, 470-74 (1993) (a capital sentencing scheme must direct and limit the sentencer’s discretion to minimize the risk of arbitrary and capricious action and must genuinely narrow the class of persons eligible for the death penalty). He criticizes
 
 Allen,
 
 99 Nev. at 488, 665 P.2d at 240, which cites NRS 175.552(3) and holds that the state may introduce evidence at a capital penalty hearing in addition to the aggravating circumstances set forth in NRS 200.033. He concludes that Nevada’s statutes therefore fail to narrow the class of defendants who are death eligible. This argument is unpersuasive.
 

 This court did not hold in
 
 Allen
 
 that evidence outside the purview of NRS 200.033 could serve to render a defendant death eligible. Only enumerated aggravating circumstances pursuant to NRS 200.033 can do this. If a jury does not find at least one enumerated aggravator, then a defendant is not eligible for the death penalty — regardless of the evidence presented pursuant to NRS 175.552(3).
 
 See
 
 NRS 200.030(4)(a); NRS 175.554(3).
 
 [8]
 
 If an enu
 
 *1117
 
 merated aggravator or aggravators are found, the jury must find that any mitigators do not outweigh the aggravators before a defendant is death eligible. NRS 200.030(4)(a); NRS 175.554(3). Even if the jury finds that any mitigators do not outweigh the aggravators, a death sentence is not automatic, and the jury must decide in light of all the relevant evidence whether it considers death the appropriate penalty. NRS 175.554(3); Geary v. State, 114 Nev. 100, 105, 952 P.2d 431, 433 (1998). At this final stage, evidence presented pursuant to NRS 175.552(3) can influence the decision to impose death, but this comes after the narrowing to death eligibility has occurred.
 
 [9]
 
 This evidence should be considered because each capital defendant must be treated as a unique human being and receive an individualized sentencing determination based upon his character and the circumstances of the crime.
 
 Homick,
 
 108 Nev. at 136, 825 P.2d at 606.
 

 Middleton also argues that this court defines too broadly the scope of aggravating circumstances, specifically its definition of prior convictions and “at random and without apparent motive.”
 
 See
 
 NRS 200.033(2) and (9). Neither of these arguments applies to Middleton’s case and needs to be addressed here.
 

 Appellant’s remaining claims warrant no relief
 

 Middleton asserts that this court lacks authority to reweigh the aggravating evidence on appeal and must remand the case for resentencing. This question is moot because the aggravators found by the jury were all valid.
 

 Middleton says that he received the maximum sentences on the counts of grand larceny, fraudulent use of a credit card, and ex-felon in possession of a firearm because of his conviction on the murder and kidnapping counts. Because his conviction should allegedly be reversed on the latter counts, he concludes that this court should vacate his other sentences and remand for resen-tencing. This issue is also moot since we have determined that Middleton was validly convicted of the murders and kidnappings.
 

 CONCLUSION
 

 Middleton’s claims lack merit. We therefore affirm his judgment of conviction and sentence.
 

 [1]
 

 As discussed below, the evidence of the kidnapping and murder of each victim was cross-admissible to prove Middleton’s identity, method, intent, and absence of mistake or accident in regard to the kidnapping and murder of the other.
 

 [2]
 

 In addition to asserting above that there was insufficient evidence that Davila’s death resulted from criminal agency, Middleton asserts here that no evidence put him in the company of Davila at any time. The presence of Davila’s hair, apparel, and blanket in Middleton’s storage unit is sufficient to tie him to Davila’s murder. Furthermore, the evidence showed that Davila and Middleton’s girlfriend, Haley, were together on several occasions and that Middleton was seen on the stairs outside Davila’s apartment on the morning that she was last seen alive.
 

 [3]
 

 In separate proceedings arising out of the circumstances of this case, Haley was convicted of burglary, possession of stolen property, and obtaining property by false pretenses. This court recently affirmed her conviction. Haley v. State, Docket No. 29051 (Order Dismissing Appeal, July 28, 1998).
 

 [4]
 

 These Federal Rules of Criminal Procedure are largely equivalent to NRS 173.115 and 174.165.
 

 [5]
 

 The district court acted within its sound discretion in declining Middleton’s proffered waiver of his right to conflict-free counsel.
 
 See
 
 Wheat v. United States, 486 U.S. 153, 163 (1988) (holding that “the district court must be allowed substantial latitude in refusing waivers of conflicts of interest .. . where a potential for conflict exists”).
 

 [6]
 

 The facts regarding Middleton’s prior conviction might have been admissible under other circumstances, but the district court is charged with the
 
 *1113
 
 responsibility of assessing the risk of unfair prejudice in determining the admissibility of evidence. In this case, the court acted within its discretion in ruling that evidence of the particular facts of the conviction was not admissible. Mr. Viloria’s disregard for this ruling appears reckless if not deliberate, particularly in light of his remarks earlier in the penalty hearing, referred to above, attacking the integrity of this nation’s Constitution. His question may constitute misconduct that is contemptuous of the trial court; even more troubling, it unnecessarily introduced the possibility of error into these capital proceedings. Consequently, we refer Mr. Viloria’s improper questioning of this witness and his contemptuous remarks to the trial court to the Nevada State Bar for investigation and possible disciplinary action.
 

 [7]
 

 NRS 200.033(8) no longer includes depravity of mind. 1995 Nev. Stat., ch. 467, § 1, at 1491.
 

 [8]
 

 NRS 200.030(4)(a) provides that a person convicted of first-degree murder shall be punished “[b]y death, only if one or more aggravating circumstances are found and. any mitigating circumstance or circumstances which are found do not outweigh the aggravating circumstance or circumstances.” NRS 175.554(3) provides: “The jury or the panel of judges may impose a sentence of death only if it finds at least one aggravating circumstance and further finds that there are no mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances found.”
 

 [9]
 

 Lisle v. State, 113 Nev. 679, 704, 941 P.2d 459, 475-76 (1997), correctly states that evidence presented pursuant to NRS 175.552(3) can also be used to determine the sentence of a defendant who is not found death eligible. To the extent that any language in
 
 Lisle
 
 suggests that this evidence can be used to determine death eligibility itself, we hereby reject that suggestion.