ZANE MICHAEL FLOYD, APPELLANT, *v.* THE
STATE OF NEVADA, RESPONDENT.

No. 36752

March 13, 2002 42 P.3d 249

---

[Rehearing denied May 7, 2002]

*Marcus D. Cooper,* Public Defender, *Curtis S. Brown,* Chief Deputy Public Defender, and *Robert L. Miller,* Deputy Public Defender, Clark County, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Stewart L. Bell,* District Attorney, and *Lynn M. Robinson,* Chief Deputy District Attorney, Clark County, for Respondent.

## OPINION

*Per Curiam:*

Early in the morning on June 3, 1999, appellant Zane Michael Floyd held a woman against her will at his apartment in Las Vegas and sexually assaulted her. He then took his shotgun, walked to a nearby Albertson's supermarket, and shot five employees, killing four of them. Floyd does not contend that the State failed to prove that he committed the crimes he was convicted of, but he asks that his conviction be reversed, arguing that he was improperly denied a change of venue. He also argues, among other things, that the charges of kidnapping and sexual assault were improperly joined at trial with the burglary, attempted murder, and murder charges; that the State was improperly allowed to discover and use psychological evidence obtained by his own expert; and that the prosecutor committed misconduct during the guilt and penalty phases of the trial.

We conclude that these claims largely lack merit and none warrant relief. We therefore affirm his conviction and sentence.

## FACTS

Early in the morning on June 3, 1999, Floyd telephoned an "outcall" service and asked that a young woman be dispatched to his apartment. As a result, a twenty-year-old woman came to Floyd's apartment around 3:30 a.m. As soon as she arrived, Floyd threatened her with a shotgun and forced her to engage in vaginal intercourse, anal intercourse, digital penetration, and fellatio. At one point he ejected a live shell from the gun, showed it to the woman, and said that her name was on it. Eventually Floyd put on Marine Corps camouflage clothing and said that he was going to go out and kill the first people that he saw. He told the woman that he had left his smaller gun in a friend's vehicle or he could have shot her. Eventually he told her she had 60 seconds to run or be killed. The woman ran from the apartment, and around 5:00 a.m. Floyd took his shotgun and began to walk to an Albertson's supermarket which was about fifteen minutes by foot from his apartment.

Floyd arrived at the supermarket at about 5:15 a.m. The store's security videotape showed that immediately after entering the store, he shot Thomas Michael Darnell in the back, killing him. After that, he shot and killed two more people, Carlos Chuck Leos and Dennis Troy Sargeant. Floyd then encountered Zachary T. Emenegger, who attempted to flee. Floyd chased him and shot him twice. Floyd then leaned over him and said, "Yeah, you're dead," but Emenegger survived. Floyd then went to the rear of the store where he shot Lucille Alice Tarantino in the head and killed her.

As Floyd walked out the front of the store, Las Vegas Metropolitan Police Department (LVMPD) officers were waiting for him. He went back in the store for a few seconds and then came out again, pointing the shotgun at his own head. After a police officer spoke with him for several minutes, Floyd put the gun down, was taken into custody, and admitted to officers that he had shot the people in the store.

The jury found Floyd guilty of four counts of first-degree murder with use of a deadly weapon, one count of attempted murder with use of a deadly weapon, one count of burglary while in possession of a firearm, one count of first-degree kidnapping with use of a deadly weapon, and four counts of sexual assault with use of a deadly weapon.

The jury found the same three aggravating circumstances in regard to each of the murders: the murder was committed by a person who knowingly created a great risk of death to more than

one person by means which would normally be hazardous to the lives of more than one person; the murder was committed at random and without apparent motive; and the defendant had, in the immediate proceeding, been convicted of more than one murder. For each murder, the jury imposed a death sentence, finding that the aggravating circumstances outweighed any mitigating circumstances. For the other seven offenses, the district court imposed the maximum terms in prison, to be served consecutively. The court also ordered restitution totaling more than $180,000.00.

## DISCUSSION

### 1. Severance of the charges

Before trial, Floyd moved unsuccessfully to sever the counts relating to the events at his apartment from those relating to the events at the supermarket. Floyd contends that two independent episodes were involved and therefore joinder of the charges was improper and prejudiced him. He quotes the Supreme Court of California:

> When a trial court considering a defendant's motion for severance of unrelated counts has determined that the evidence of the joined offenses is not "cross-admissible," it must then assess the relative strength of the evidence as to each group of severable counts and weigh the potential impact of the jury's consideration of "other crimes" evidence. I.e., the court must assess the likelihood that a jury not otherwise convinced beyond a reasonable doubt of the defendant's guilt of one or more of the charged offenses might permit the knowledge of the defendant's other criminal activity to tip the balance and convict him. If the court finds a likelihood that this may occur, severance should be granted.[1]

This appears to be a sound statement of law, but it is not applicable here. The California court was considering the joinder of "unrelated counts." We conclude that the counts here were related and that the evidence of each set of crimes was relevant and admissible to prove the other.

NRS 173.115 provides that multiple offenses may be charged in the same information if the offenses charged are based either "on the same act or transaction" or "on two or more acts or transactions connected together or constituting parts of a common scheme or plan." Also, if "evidence of one charge would be cross-admissible in evidence at a separate trial on another charge, then both charges may be tried together and need not be sev-

---

[1]*People v. Bean,* 760 P.2d 996, 1006 (Cal. 1988) (citation omitted).

ered."[2] Here, joinder was proper because the acts charged were at the very least "connected together." The crimes at the supermarket began only about fifteen minutes after the crimes at the apartment ended, and Floyd used the same shotgun in committing both sets of crimes. Moreover, his actions and statements in committing the crimes at his apartment were particularly relevant to the question of premeditation and deliberation regarding the murders at the supermarket. Likewise, Floyd's actions and demeanor and possession of the shotgun at the supermarket corroborated the testimony of the sexual assault victim and would have been relevant, at a separate trial, to prove more than just Floyd's character. Thus, the evidence of the two sets of crimes was cross-admissible.[3]

Even if joinder is permissible under NRS 173.115, a trial court should sever the offenses if the joinder is "unfairly prejudicial."[4] NRS 174.165(1) provides that if a defendant is prejudiced by joinder of offenses, the district court may order separate trials of counts "or provide whatever other relief justice requires." Floyd quotes the Montana Supreme Court regarding the types of prejudice that can result from joinder of charges:

> The first kind of prejudice results when the jury considers a person facing multiple charges to be a bad man and tends to accumulate evidence against him until it finds him guilty of something. The second type of prejudice manifests itself when proof of guilt on the first count in an information is used to convict the defendant of a second count even though the proof would be inadmissible at a separate trial on the second count. The third kind of prejudice occurs when the defendant wishes to testify on his own behalf on one charge but not on another.[5]

The decision to sever is within the discretion of the district court, and an appellant has the "heavy burden" of showing that the court abused its discretion.[6] To establish that joinder was prejudicial "requires more than a mere showing that severance might have made acquittal more likely."[7] We conclude that Floyd has not shown that he was unfairly prejudiced by joinder of charges. The evidence of the burglary, murders, and attempted murder was

---

[2]*Mitchell v. State,* 105 Nev. 735, 738, 782 P.2d 1340, 1342 (1989).

[3]*See* NRS 48.045(2); *Middleton v. State,* 114 Nev. 1089, 1108, 968 P.2d 296, 309 (1998).

[4]*Middleton,* 114 Nev. at 1107, 968 P.2d at 309.

[5]*State v. Campbell,* 615 P.2d 190, 198 (Mont. 1980).

[6]*Amen v. State,* 106 Nev. 749, 756, 801 P.2d 1354, 1359 (1990).

[7]*United States v. Wilson,* 715 F.2d 1164, 1171 (7th Cir. 1983).

overwhelming. The evidence of the kidnapping and sexual assaults was substantial and uncontradicted. He has not shown that the jury improperly accumulated evidence against him, that it used the proof of one count improperly to convict him of another count, or that the joinder prevented him from testifying on any charges. Thus the district court did not err in denying Floyd's motion to sever the charges.

## 2. *Pretrial coverage of the crimes and change of venue*

The district court denied Floyd's motion for a change of venue. He claims that this was error because jurors were biased by the extensive and prominent coverage of his case by the print and broadcast media in Las Vegas. The State does not dispute that the media coverage of the case was massive. It simply points out that Floyd presents no evidence that this coverage resulted in bias on the part of any juror.

NRS 174.455(1) provides that a criminal action "may be removed from the court in which it is pending, on application of the defendant or state, on the ground that a fair and impartial trial cannot be had in the county where the indictment, information or complaint is pending." Whether to change venue is within the sound discretion of the district court and will not be disturbed absent a clear abuse of discretion.[8] A defendant seeking to change venue must not only present evidence of inflammatory pretrial publicity but must demonstrate actual bias on the part of the jury empaneled.[9] Even where pretrial publicity has been pervasive, this court has upheld the denial of motions for change of venue where the jurors assured the district court during voir dire that they would be fair and impartial in their deliberations.[10]

Floyd does not point to evidence that any empaneled juror was biased and does not even refer to the voir dire of the prospective jurors. Review of the voir dire shows that when asked about pretrial publicity, the jurors who were ultimately empaneled indicated that it would not influence their decision. It appears that every juror also expressed a willingness to consider sentences other than death in the event of a guilty verdict. We conclude that the district court did not err in denying the motion for a change of venue.

[8]*Sonner v. State,* 112 Nev. 1328, 1336, 930 P.2d 707, 712 (1996), *modified on rehearing on other grounds,* 114 Nev. 321, 955 P.2d 673 (1998).

[9]*Id.*

[10]*Id.* at 1336, 930 P.2d at 712-13; *see also Ford v. State,* 102 Nev. 126, 129-32, 717 P.2d 27, 29-31 (1986).

### 3. Finding probable cause for aggravating circumstances

Floyd argues that before the State can allege aggravating circumstances and seek the death penalty, a grand jury or a justice court must first find probable cause for the circumstances. He cites the Fifth Amendment to the United States Constitution and Article 1, Section 8, of the Nevada Constitution, which require indictment by a grand jury or the filing of an information before a person can be tried for a capital or other "infamous" crime.[11] Floyd's argument has no merit.

The United States Supreme Court has stated: "Aggravating circumstances are not separate penalties or offenses, but are 'standards to guide the making of [the] choice' between the alternative verdicts of death and life imprisonment."[12] Therefore, an aggravating circumstance alleged in a capital proceeding does not constitute a separate crime that requires a finding of probable cause under the U.S. or Nevada constitutions.

Floyd also relies on the Supreme Court's holding in *Jones v. United States* that "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt."[13] *Jones* does not support Floyd's proposition either. The Court emphasized that its holding in *Jones* did not apply to aggravating circumstances because "the finding of aggravating facts falling within the traditional scope of capital sentencing [is] a choice between a greater and lesser penalty, not . . . a process of raising the ceiling of the sentencing range available."[14]

We conclude that a probable cause finding is not necessary for the State to allege aggravating circumstances and seek a death sentence.

---

[11]*See* U.S. Const. amend. V; Nev. Const. art. 1, § 8, cl. 1; *see also Hurtado v. California*, 110 U.S. 516, 538 (1884) (holding it constitutional for states to proceed in criminal actions by information following preliminary examination and finding of probable cause, rather than by grand jury indictment).

[12]*Poland v. Arizona*, 476 U.S. 147, 156 (1986) (quoting *Bullington v. Missouri*, 451 U.S. 430, 438 (1981)).

[13]526 U.S. 227, 243 n.6 (1999); *see also Apprendi v. New Jersey*, 530 U.S. 466, 478, 490 (2000).

[14]*Jones*, 526 U.S. at 251; *see also Apprendi*, 530 U.S. at 496 ("[T]his Court has previously considered and rejected the argument that the principles guiding our decision today render invalid state capital sentencing schemes requiring judges, after a jury verdict holding a defendant guilty of a capital crime, to find specific aggravating factors before imposing a sentence of death.").

## 4. *The State's use of psychological evidence garnered by a defense expert*

Before trial, Floyd filed a supplemental notice that he might call neuropsychologist David L. Schmidt as an expert witness. Floyd opposed reciprocal discovery, but the district court ordered him to provide the State with Schmidt's report on his examination of Floyd, which included the results of standardized psychological tests administered to Floyd. The defense later unendorsed Schmidt as a witness, and Schmidt did not testify. During the penalty phase of trial, Floyd called a different psychologist, Edward J. Dougherty, Ed.D., to testify regarding Floyd's mental health. In rebuttal and over Floyd's objection, the State called psychologist Louis Mortillaro, Ph.D., who provided his opinion on Floyd's mental status, relying in part on the results from the standardized tests administered by Schmidt. The district court did not permit the State to use anything from Schmidt's report other than the raw test data. Floyd argues that Mortillaro's testimony violated his constitutional rights, relevant Nevada statutes, and his attorney-client privilege.

NRS 174.234(2) provides that in a gross misdemeanor or felony prosecution, a party who intends to call an expert witness during its case in chief must, before trial, file and serve upon the opposing party a written notice containing:

> (a) A brief statement regarding the subject matter on which the expert witness is expected to testify and the substance of his testimony;
> (b) A copy of the curriculum vitae of the expert witness; and
> (c) A copy of all reports made by or at the direction of the expert witness.

NRS 174.245(1)(b) similarly provides in part that the defendant must allow the prosecutor to inspect and copy any "[r]esults or reports of physical or mental examinations, scientific tests or scientific experiments that the defendant intends to introduce in evidence during the case in chief of the defendant." Furthermore, resolution of discovery issues is normally within the district court's discretion.[15]

Addressing first the claim that Schmidt's report and test results were privileged work-product, we conclude that it has no merit. " 'At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which

---

[15]*Lisle v. State,* 113 Nev. 679, 695, 941 P.2d 459, 470 (1997).

he can analyze and prepare his client's case.' "[16] NRS 174.245(2)(a) apparently codifies this privilege, providing that "[a]n *internal* report, document or memorandum that is prepared by or on behalf of the defendant or his attorney in connection with the investigation or defense of the case" is not subject to discovery.[17] Floyd has failed to show that Schmidt's report or the test results were internal documents representing the mental processes of defense counsel in analyzing and preparing Floyd's case. We conclude that they were discoverable as "[r]esults or reports of physical or mental examinations" that Floyd originally intended to introduce in evidence.[18]

Next Floyd argues that the State's discovery and use of the Schmidt materials was improper because in his view he did not introduce those materials or any psychological evidence during his "case in chief." NRS 174.234(2) and 174.245(1)(b) require discovery from the defendant only where he intends to call an expert witness or to introduce certain evidence during his "case in chief." Floyd introduced psychological evidence only in the penalty phase, not in the guilt phase, and he assumes that in a capital murder trial "case in chief" refers only to the guilt phase of the trial, not the penalty phase. He offers no authority or rationale for this assumption, and we conclude that it is unfounded.

*Black's Law Dictionary* defines "case in chief" as "[t]hat part of a trial in which the party with the initial burden of proof presents his evidence after which he rests."[19] The statutes in question refer to "the case in chief of the defendant" as well as "of the state," even though a criminal defendant normally has no burden of proof. It is clear that the statutes use the term "case in chief" to refer to either party's initial presentation of evidence, in contrast to either's presentation of rebuttal evidence. This meaning is consistent with the context of discovery: before trial a party should know and be able to disclose evidence it expects to present in its case in chief, whereas the need for and nature of rebuttal evidence is uncertain before trial. This meaning is also consistent with the use of the term in this court's case law.[20]

The State has the burden of proof in both phases of a capital

---

[16]*Id.* (quoting *United States v. Nobles,* 422 U.S. 225, 238 (1975)).

[17]Emphasis added.

[18]NRS 174.245(1)(b); *see also* NRS 174.234(2)(c).

[19]*Black's Law Dictionary* 216 (6th ed. 1990).

[20]*See, e.g., Batson v. State,* 113 Nev. 669, 677, 941 P.2d 478, 483 (1997).

trial: first, in proving that a defendant is guilty of first-degree murder; and second, if such guilt is proven, in proving that aggravating circumstances exist and are not outweighed by any mitigating circumstances. In both phases, the defense has the choice of presenting its own case in response to the State's. Therefore, we conclude that the term "case in chief" in NRS 174.234(2) and 174.245(1)(b) encompasses the initial presentation of evidence by either party in the penalty phase of a capital trial.

Floyd nevertheless maintains that it was improper for the State's expert, who testified in rebuttal, to use the test results obtained by Schmidt after the defense had decided not to call Schmidt as a witness. We conclude that the use of the evidence here was permissible.

A United States Supreme Court case provides some guidance. In *Buchanan v. Kentucky,* the Supreme Court considered "whether the admission of findings from a psychiatric examination of petitioner proffered solely to rebut other psychological evidence presented by petitioner violated his Fifth and Sixth Amendment rights where his counsel had requested the examination and where petitioner attempted to establish at trial a mental-status defense."[21] The Court concluded that it did not.[22] At his trial, petitioner Buchanan had "attempted to establish the affirmative defense of 'extreme emotional disturbance.' "[23] He introduced evidence from various evaluations of his mental condition done after an earlier burglary arrest.[24] In response and over Buchanan's objection, the prosecution introduced evidence from a psychological evaluation of Buchanan done at his and the prosecution's joint request after his arrest for the murder in question; Buchanan had not introduced any evidence from the evaluation.[25] The Court reasoned that if a defendant "presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested."[26] The Court noted that Buchanan presented a mental-status defense and introduced psychological evidence, that he did not take the stand, and that the prosecution could respond to this defense only by presenting other psychological evidence.[27] The prosecution therefore introduced excerpts from the

---

[21] 483 U.S. 402, 404 (1987).

[22] *Id.* at 421-25; *see also State v. Fouquette,* 67 Nev. 505, 538, 221 P.2d 404, 421 (1950).

[23] *Buchanan,* 483 U.S. at 408.

[24] *Id.* at 409 & n.9.

[25] *See id.* at 410-12.

[26] *Id.* at 422-23.

[27] *Id.* at 423.

evaluation requested by Buchanan, which set forth the psychiatrist's "general observations about the mental state of petitioner but had not described *any* statements by petitioner dealing with the crimes for which he was charged."[28] The Court concluded: "The introduction of such a report for this limited rebuttal purpose does not constitute a Fifth Amendment violation."[29] Also, since defense counsel had requested the psychological evaluation and was on notice that the prosecution would likely use psychological evidence to rebut a mental-status defense, the court concluded that there was no violation of the Sixth Amendment right to counsel.[30]

We conclude that under the circumstances of this case the State's use of evidence obtained from Floyd by his own expert did not violate Floyd's constitutional rights. We rely on a number of factors in reaching this conclusion. First, similar to *Buchanan,* the evidence was used only in rebuttal after Floyd introduced evidence of his mental status as a mitigating factor. Second, the district court restricted the State's use of evidence contained in the defense expert's report to the standardized psychological test results. Like *Buchanan,* this evidence did not describe any statements by Floyd dealing with his crimes which could incriminate him or aggravate the crimes, nor did it include any conclusions reached by the defense expert. Third, the jury was not informed that the source of the evidence was originally an expert employed by the defense, avoiding the risk of undue prejudice inherent in such information.[31]

### 5. *Miranda and appellant's statements to police*

Floyd claims that evidence of his first comments made to police after his arrest was admitted in violation of *Miranda v. Arizona.*[32] He also claims that evidence of his other statements to police should have been suppressed because his waiver of his *Miranda* rights was not voluntary and knowing.

After Floyd was handcuffed at the crime scene and before being questioned, he told LVMPD officers, "I can't believe I shot those people." Noticing that Floyd had on Marine Corps clothing, the arresting officer briefly spoke to him about the Marine Corps and then informed him of his *Miranda* rights. Floyd acknowledged that he understood his rights and agreed to talk. His statement was tape-recorded. Around 7:00 a.m., Floyd gave another tape-

---

[28]*Id.*

[29]*Id.* at 423-24.

[30]*Id.* at 424-25.

[31]*Cf. Lange v. Young,* 869 F.2d 1008, 1014 (7th Cir. 1989); *United States ex rel. Edney v. Smith,* 425 F. Supp. 1038, 1053 (E.D.N.Y. 1976).

[32]384 U.S. 436 (1966).

recorded statement at the Clark County Detention Center after again being informed of his *Miranda* rights. The two statements were basically consistent. Floyd remembered shooting only the first and last victims. He also told police that he had been out with his girlfriend and others the night before. He had been drinking heavily and began playing blackjack. His girlfriend became angry and left, and he lost most of his money. He did not tell the police about the sexual assaults earlier that morning, but he told them that he had left his pistol in a friend's vehicle, a detail which is consistent with what the sexual assault victim said he had told her. In his first statement he denied any recent use of methamphetamine, but in the second he said that he had taken one small line of methamphetamine not long before the shootings.

The arresting officer testified that when Floyd gave his first statement he smelled of alcohol, was very excited and rambling, and had to be calmed down. A blood sample taken from Floyd at 8:00 a.m. the morning of the crimes showed that he had a blood alcohol level of 0.09 percent. An LVMPD criminalist estimated that the level would have been about 0.14 percent around the time of the shootings. A test for controlled substances proved negative.

*Miranda* holds that evidence of a suspect's statements made during custodial interrogation is inadmissible at trial unless the police first informed the suspect of his Fifth Amendment privilege against self-incrimination.[33] "Interrogation" means not only express questioning, but any words or actions that "police should know [are] reasonably likely to evoke an incriminating response from a suspect."[34] Though informed of his *Miranda* rights, unless the defendant knowingly and voluntarily waived them, statements made during custodial interrogation are inadmissible.[35] The State must prove by a preponderance of the evidence that the waiver was knowing and intelligent.[36] To determine the validity of the waiver, this court examines "the facts and circumstances of the case such as the background, conduct and experience of the defendant."[37] Relevant considerations in determining the voluntariness of a confession include the youth of the defendant, his lack of education or low intelligence, the lack of advice of constitutional rights, the length of detention, repeated and prolonged questioning, and physical punishment such as deprivation of food or sleep.[38] The

---

[33]*See* 384 U.S. at 479.

[34]*Rhode Island v. Innis,* 446 U.S. 291, 301 (1980).

[35]*See Miranda,* 384 U.S. at 479.

[36]*Falcon v. State,* 110 Nev. 530, 534, 874 P.2d 772, 775 (1994); *Tomarchio v. State,* 99 Nev. 572, 576, 665 P.2d 804, 807 (1983).

[37]*Falcon,* 110 Nev. at 534, 874 P.2d at 774-75.

[38]*Chambers v. State,* 113 Nev. 974, 981, 944 P.2d 805, 809 (1997).

admissibility of a confession is primarily a factual question; this court should not disturb the district court's determination if it is supported by substantial evidence.[39]

Before the arresting officer informed Floyd of his *Miranda* rights, Floyd made several incriminating admissions. He argues that evidence of these admissions should have been suppressed. Although Floyd was in custody at the time in question, he was not subjected to interrogation: the record shows that the officer did not do or say anything reasonably likely to elicit incriminating statements from Floyd in the brief time before the *Miranda* warnings were given. Therefore, Floyd's initial comments were admissible.

The record also supports the determination that Floyd waived his rights and made his admissions voluntarily and intelligently. At the time he spoke to police, Floyd was in his early 20s and had served four years in the Marine Corps. The record shows that Floyd had an average score on an intelligence test. He made most of his admissions after being advised of his *Miranda* rights. He began making the admissions immediately after his arrest; no lengthy detention or repeated or prolonged questioning occurred. He was not in physical discomfort, nor did police deprive him of food or sleep. He was somewhat intoxicated, but intoxication renders a confession inadmissible only if the defendant was so intoxicated that he could not understand the meaning of his comments.[40] Although Floyd was obviously agitated and even somewhat bewildered by what he had done, the record shows that he understood what he was saying. His statements remained consistent and were accurate, as is borne out by the other evidence of the crimes. We conclude that Floyd acted voluntarily and intelligently and that the district court did not err in admitting evidence of his statements.

6. *Prosecutorial misconduct*

Floyd asserts that several comments by the prosecution constituted misconduct. A prosecutor's comments should be considered in context, and "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone."[41]

---

[39]*Id.*

[40]*See Kirksey v. State,* 112 Nev. 980, 992, 923 P.2d 1102, 1110 (1996).

[41]*United States v. Young,* 470 U.S. 1, 11 (1985).

Moreover, Floyd failed to object to some of the remarks.[42] Most of the comments require no discussion because they all either were proper or did not amount to prejudicial error.

However, we will discuss one comment which was inappropriate. During closing argument in the guilt phase, the prosecutor told the jury that Floyd "perpetrated the worst massacre in the history of Las Vegas." The jury began its deliberations soon after. Defense counsel then objected to the prosecutor's remark as prejudicial and inflammatory. The district court responded: "I think [the remark] isn't within the evidence. I also don't think it is true. What remedy would you suggest, now that the jury is gone? If you wish, I'll bring them back in and say that that wasn't proper argument." Defense counsel declined that proposal because he thought "an admonition would be moot and would raise more attention than the original comment."

The district court was correct that the record contains nothing to support the prosecutor's remark, and it is elementary that "a prosecutor may not make statements unsupported by evidence produced at trial."[43] The remark was therefore improper.[44] We caution prosecutors to refrain from inflammatory rhetoric: "Any inclination to inject personal beliefs into arguments or to inflame the passions of the jury must be avoided. Such comments clearly exceed the boundaries of proper prosecutorial conduct."[45] Here,

---

[42]*Riley v. State,* 107 Nev. 205, 218, 808 P.2d 551, 559 (1991) (stating that generally this court will not consider whether a prosecutor's remarks were improper unless the defendant objected to them at the time, allowing the district court to rule upon the objection, admonish the prosecutor, and instruct the jury); *cf.* NRS 178.602 (providing that despite lack of objection, this court may address an error if it was plain and affected a defendant's substantial rights).

[43]*Guy v. State,* 108 Nev. 770, 780, 839 P.2d 578, 585 (1992); *see also Leonard v. State,* 114 Nev. 1196, 1212, 969 P.2d 288, 298 (1998); *Collier v. State,* 101 Nev. 473, 478, 705 P.2d 1126, 1129 (1985).

[44]The State contends that the comment was "simply an accurate statement of fact known to anyone who has lived in Las Vegas any length of time, and akin to arguing in the Timothy McVeigh case that the Oklahoma bombing was the worst massacre in the history of the State of Oklahoma." This extravagant comparison is neither apt nor persuasive. The multiple murders in this case were an exceptional occurrence, but even a quick look at this court's case law shows that unfortunately they do not stand alone in Las Vegas history. In 1992, four people were shot to death in a Las Vegas apartment in the presence of two young children. *See Evans v. State,* 112 Nev. 1172, 926 P.2d 265 (1996).

[45]*Shannon v. State,* 105 Nev. 782, 789, 783 P.2d 942, 946 (1989).

given the overwhelming evidence of Floyd's guilt, we conclude that the error was harmless.[46]

## 7. *Victim impact testimony*

Floyd also contends that the prosecution committed misconduct by eliciting improper victim impact testimony.

Mona Nall, the mother of murder victim Thomas Darnell, testified during the penalty phase. She related an incident in which her son was assaulted and kidnapped. When she began to tell how the kidnappers came to her own house, the district court initially sustained an objection by defense counsel. After the prosecutor said the testimony would become relevant to show who the victim was, the court said it would permit some more questioning. The witness then testified that she, her husband, their son, and their 16-year-old daughter were held hostage for seven hours and the daughter was sexually assaulted. Defense counsel again objected, and the court asked the prosecutor, "If you have something of relevance to show . . ., would you get to that point, please?" The witness then said that her son was held hostage for over 30 days and was finally released in the Utah desert after his abductors tried to cut off his ears.

Victim impact testimony is permitted at a capital penalty proceeding under NRS 175.552(3) and under federal due process standards, but it must be excluded if it renders the proceeding fundamentally unfair.[47] The United States Supreme Court has stated that victim impact evidence during a capital penalty hearing is relevant to show each victim's "uniqueness as an individual human being."[48] Admissibility of testimony during the penalty phase of a capital trial is a question within the district court's discretion, and this court reviews only for abuse of discretion.[49] Here, although the jurors heard the evidence, it is apparent that the district court actually considered it irrelevant.

NRS 175.552(3) provides that "evidence may be presented concerning aggravating and mitigating circumstances relative to the offense, defendant or victim and on any other matter which the court deems relevant to sentence, whether or not the evidence

---

[46]*See* NRS 178.598 ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.").

[47]*Leonard,* 114 Nev. at 1214, 969 P.2d at 300.

[48]*Payne v. Tennessee,* 501 U.S. 808, 823 (1991).

[49]*Rippo v. State,* 113 Nev. 1239, 1261, 946 P.2d 1017, 1031 (1997).

is ordinarily admissible.'' Nevertheless, NRS 48.035(1) remains applicable in a capital penalty proceeding and provides that even relevant evidence ''is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues or of misleading the jury.''[50]

Some evidence of the travails that victim Thomas Darnell endured in his life was certainly relevant, but evidence that his entire family was kidnapped and his sister sexually assaulted was so collateral and inflammatory that it violated NRS 48.035(1) and exceeded the scope of appropriate victim impact testimony. Though the evidence should have been excluded, it was not so unduly prejudicial that it rendered the proceeding fundamentally unfair; therefore, reversal of the sentence is not warranted.[51]

Floyd also complains that the district court denied his motion to allow only one victim impact witness for each murder victim and to exclude other testimony. In fact, the court granted the motion in regard to limiting victim impact witnesses to one per murder victim. The court also ruled that other people who were at the scene of the murders could testify, not as victims but in regard to the great-risk-of-death aggravator and the nature of the murders. Floyd has not shown that there was anything improper about the court's ruling.

### 8. *Mandatory review of the death sentences*

NRS 177.055(2) requires this court to review every death sentence and consider in addition to any issues raised on appeal:

> (b) Whether the evidence supports the finding of an aggravating circumstance or circumstances;
> (c) Whether the sentence of death was imposed under the influence of passion, prejudice or any arbitrary factor; and
> (d) Whether the sentence of death is excessive, considering both the crime and the defendant.

The same three aggravating circumstances were found for each murder: it was committed by a person who knowingly created a great risk of death to more than one person by means which would

---

[50]*See McKenna v. State,* 114 Nev. 1044, 1051-52, 968 P.2d 739, 744 (1998) (recognizing that admissible penalty evidence must satisfy NRS 48.035(1)).

[51]*See McNelton v. State,* 111 Nev. 900, 906, 900 P.2d 934, 938 (1995) (citing *Payne,* 501 U.S. at 825).

normally be hazardous to the lives of more than one person; it was committed at random and without apparent motive; and Floyd had, in the immediate proceeding, been convicted of more than one murder. The evidence supports the finding of each of these circumstances. The first is established by the fact that Floyd repeatedly fired a shotgun while walking and running through a supermarket where a number of people were present. The second is amply supported by a record that shows that Floyd knew nothing about the people he killed or why he had killed them. For example, immediately after his arrest, Floyd said, "Why did I kill those people? I, I don't know." Finally, Floyd was convicted of four murders in this case, establishing the third circumstance.

We see no indication that the sentences of death were imposed under the influence of passion, prejudice, or any arbitrary factor. We also conclude that the death sentences in this case are not excessive.

Floyd presented a number of witnesses to testify in mitigation. A family friend and a coworker both testified that they knew him to be a good person and that the person who committed the crimes in this case was not the Zane Floyd they knew. The coworker and Floyd's stepfather testified respectively that when they met Zane in jail immediately after the crimes he was "like a zombie" and "wasn't there." His stepfather also told of Floyd's difficulties and behavioral problems in school and of how well he later did in the Marine Corps. A former Marine who served with Floyd as an instructor in combat training school testified that Floyd was the best instructor, that "in the field, he would be a perfect Marine," but that "on his own" he did not do well.

Floyd's close friend testified that he and Floyd began using marijuana and methamphetamine when they were fifteen or sixteen. The friend testified that Floyd's mother was often intoxicated and that on Floyd's sixteenth birthday his stepfather played drinking games with Floyd and his friends. After Floyd returned from the Marines, his friend reintroduced him to methamphetamine, which they sometimes used without sleeping for several days.

Floyd's mother testified about her own drug and alcohol abuse and the loss of her first child, which caused her to drink even more. When she became pregnant with Floyd, her husband was displeased, they separated, and he filed for divorce just before Floyd's birth. She described Floyd's learning and behavioral problems as a child. She also spoke about how he played baseball and loved animals.

A clinical social worker and psychoanalyst conducted a psychosocial evaluation of Floyd and testified to the following. Floyd's mother had used various illegal controlled substances and abused alcohol. Floyd's stepfather also abused alcohol and was sometimes violent towards Floyd's mother. Floyd had difficulties in school and began drinking when he was fifteen and using methamphetamine when he was sixteen. He enlisted in the Marine Corps at age seventeen. After four years he was honorably discharged on condition that he not reenlist because of his alcohol problems. When he was twenty-two, Floyd attempted to contact his biological father, who refused any contact. Returning home from the military, Floyd lived with his parents. He had no driver's license because of a DUI. He worked for a short time at Costco, but was terminated. He then obtained employment as a security guard, but lost that job in May 1999. That same month his cousin was killed, which affected him and other family members deeply.

Psychologist Dr. Dougherty testified and gave his opinion that Floyd

> suffers from the mental disease of mixed personality disorder with borderline, paranoid, and depressive features. In addition, I confirmed the prior diagnosis of attention deficit hyperactivity disorder . . . . It's my opinion . . . that Mr. Floyd's reasoning was impaired as to rational thought at times, and at times he did not act knowingly and purposely at the time of the alleged incident. His symptoms were exacerbated by a long history of the ingestion of drugs and alcohol.

Floyd spoke in allocution and took responsibility for what he had done and said he could not tell why he did it. He said he was sorry and would regret his actions for the rest of his life.

This mitigating evidence is not insignificant, but given the aggravating circumstances and the multiple, brutal, unprovoked murders in this case, we do not deem the death sentences excessive.

## CONCLUSION

We affirm Floyd's judgment of conviction and sentence.

MAUPIN, C. J., with whom AGOSTI, J., agrees, concurring:

I concur in the result reached by the majority, but write separately to state my view that there was no prosecutorial misconduct at trial in connection with the "massacre" argument.

It is true that no facts on the record technically demonstrated that the killings in this case constituted the "*worst* massacre in the history of Las Vegas." (Emphasis added.) However, whether the killing spree perpetrated by appellant was or was not the worst

"massacre" is of little moment. What appellant did was a "massacre" by any definition of the word. While the rhetoric was not specifically accurate, the argument was a legitimate comment on the apparent random gunning down of five people, killing four of them.