OPINION
 

 By the Court,
 

 Douglas, J.:
 

 In this appeal, we consider whether parties in criminal cases are required to give notice of expert rebuttal witnesses. We also consider whether the State’s failure to formally file an allegation of habitual criminality precludes the district court from imposing an enhanced sentence under NRS 207.010.
 

 Although we promulgate a new rule of criminal procedure requiring parties in criminal cases to give notice of expert rebuttal witnesses, we hold that the State’s failure to provide such notice in this case does not require reversal. We further conclude that the district court improperly sentenced appellant as a habitual criminal under NRS 207.010, where the State failed to file a notice of habitual criminality and failed to charge appellant as a habitual criminal in the indictment. We also address appellant’s other assignments of error.
 

 FACTS AND PROCEDURAL HISTORY
 

 A
 
 jury convicted appellant James Grey of false imprisonment by using a person as a human shield. The crime occurred on the morning of March 19, 2005, inside a gas station convenience store where police had been summoned because Grey was causing a disturbance.
 

 Earlier that morning, Grey had approached the victim, Trade Fryer, and requested her to give-him a ride in her car. Fryer, who was previously acquainted with Grey, initially refused, but when Grey jumped into the passenger seat uninvited, she agreed to give him a ride after she picked up some friends. According to Fryer, Grey seemed agitated and insisted that someone had spiked his drink and tried to rob him. After Fryer had picked up her friends, Grey also claimed that he had a gun in his possession.
 

 When Grey eventually threatened to throw Fryer out of her car and take it, she pulled into a gas station and went inside a convenience store, where her friends joined her. After Grey also exited the car, Fryer and her friends reentered it and attempted to drive off leaving Grey behind. Grey jumped onto one of the running boards, however, and smashed one of the windows, prompting Fryer to bring the car to a stop. Her friends then fled back into the convenience store, but Fryer remained behind for a short time talking to Grey until he eventually grabbed the ignition key and broke it. She then reentered the store.
 

 
 *114
 
 A store employee who had witnessed these events called 911 to summon the police. When they arrived, Grey retreated into the store and grabbed Fryer around her neck, made a motion as if he were reaching into his waistband, and started yelling that he was going to kill one of the pursuing police officers. The police were eventually able to take Grey into custody after they had tazed him multiple times. At trial, the State showed the jury the video surveillance tapes of the events that took place at the convenience store.
 

 Following Grey’s arrest and transport to the Clark County Detention Center, Grey asked the medical staff at the detention center, allegedly on numerous occasions, to test him for drugs. Grey reported to the medical staff that someone had spiked his beer earlier in the day and attributed his behavior to drinking the spiked beer. The medical staff did not perform any blood draws on or collect urine samples from Grey.
 

 While being checked by the medical staff, Grey apparently started preaching about a revolution involving James Earl Ray, who had assassinated Martin Luther King, Jr. Because of this preaching, Grey was placed in the psychiatric ward at the detention center. While there, Grey refused to eat and continued to preach. He also stood in front of his door completely naked. According to Grey, he had never been diagnosed as paranoid schizophrenic, bipolar, or as having any other mental illnesses.
 

 Ultimately, the State charged Grey with false imprisonment by using a person as a human shield. Grey’s defense at trial was that he was involuntarily intoxicated when he committed the alleged crime.
 

 Grey had a history of drug use, including the use of cocaine and methamphetamine. He testified on direct examination at trial that he had been arrested for possession of drug paraphernalia, and he acknowledged on cross-examination that he had been stopped by the police for attempting to steal cocaine and on another occasion for possibly being under the influence of methamphetamine. The State also introduced Grey’s prior convictions for assault with a deadly weapon and possession of a controlled substance into evidence at trial.
 

 Despite his history of drug use, Grey claimed at trial that he had not knowingly taken any drugs on the day of the incident. According to Grey, he did not necessarily remember the events at issue and testified that much of his recollection came from various reports that he had reviewed. Grey further testified at trial that he had not used drugs for six to nine months before his arrest in this case and that he felt different on the day of the incident as compared to times when he had taken drugs. Additionally, he testified that earlier on the day of the incident, when he was drinking a beer, he had gone to the bathroom for a brief moment and did not take his can of beer with him. Essentially, Grey claimed at trial
 
 *115
 
 that someone had spiked his beer while he was in the bathroom. On cross-examination, however, Grey admitted that his beer did not look or taste different when he came back from the bathroom. Further, Grey admitted that he never saw anyone put anything in his drink. And, the record indicates that Grey may have informed the medical staff at the detention center that he had taken methamphetamine that day.
 

 Before Grey testified, the defense called Dr. Michael Krelstein, a clinical psychiatrist, as an expert witness. Based on the reports he reviewed and his interviews with Grey, Dr. Krelstein testified that Grey’s actions on the day of the incident were essentially the result of involuntary intoxication. Dr. Krelstein indicated that toxicology reports could have further assisted him in determining the nature of Grey’s intoxication, but he nonetheless testified that Grey’s conduct on the day of the incident suggested that he was under the influence of phencyclidine (PCP) and that its use was involuntary. Dr. Krelstein further testified that based on his research for this case, he believed that PCP was soluble in alcohol. On cross-examination, however, Dr. Krelstein admitted that he did not know whether Grey took methamphetamine on the day of the incident and that his theory was only valid on the assumption that Grey did not voluntarily consume something.
 

 After the defense rested, the State indicated its intent to call Dr. Michael Fitting Karagiozis as an expert rebuttal witness. The State’s notice of witnesses did not include any expert rebuttal witnesses even though Grey’s notice of expert witnesses stated that Dr. Krelstein would testify in Grey’s case in chief.
 

 Before Dr. Karagiozis testified, the district court asked the State why it needed an expert rebuttal witness. In response, the State contended that it was entitled to have an expert address the defense’s theory of the case. Grey objected on the ground that Dr. Karagiozis was not qualified to render an opinion regarding mental health, drug abuse, or involuntary intoxication. Consequently, the district court allowed Grey’s defense counsel to examine Dr. Karagiozis, outside the jury’s presence, to determine whether he was qualified to be an expert witness.
 

 After the defense and the State questioned Dr. Karagiozis as to his education, credentials, and experience as an expert witness, the State offered Dr. Karagiozis as an expert. When the district court inquired whether Grey had any objections, Grey’s defense counsel answered in the negative. Accordingly, the district court recognized Dr. Karagiozis as an expert rebuttal witness.
 

 During its direct examination, the State made a record of the fact that Dr. Karagiozis had sat in and listened to Dr. Krelstein’s testimony and to Grey’s testimony. As to whether he agreed with Dr. Krelstein’s opinion that Grey was under the influence of PCP, Dr. Karagiozis stated that he had some concerns with that opinion. According to Dr. Karagiozis, the oral ingestion of PCP would not
 
 *116
 
 have caused Grey to act in the manner he did on the day of the incident, and Grey’s actions were inconsistent with somebody rapidly tripping on PCP.
 

 Further, Dr. Karagiozis testified that if the alleged PCP used to spike Grey’s beer was in freebase form, it would have taken the PCP a very long time to completely dissolve in the beer; and if it was in the form of salt, the beer would have immediately bubbled over, while the PCP dissolved rapidly. As a result, Dr. Karagiozis explained that Dr. Krelstein’s review did not take into account which form of PCP was used and that the evidence presented suggested that nothing was introduced into Grey’s beer.
 

 Additionally, according to Dr. Karagiozis, the only tasteless drugs that could have been placed in Grey’s beer in the short time frame discussed by Grey would be gamma hydroxybutyric acid (GHB) or Rohypnol. Because GHB and Rohypnol would have caused Grey to become unconscious within thirty minutes, Dr. Karagiozis testified that Grey could not have been under the influence of either drug. Ultimately, Dr. Karagiozis concluded that Grey’s reported behavior on the day of the incident was not consistent with his having been under the influence of PCP or any mind-altering substance.
 

 On cross-examination, Dr. Karagiozis acknowledged that he did not have an opportunity to review the medical reports that Dr. Krelstein had considered in making his opinion and that he did not have the opportunity to read any of the police reports, the grand jury testimony, or the witnesses’ voluntary statements. Additionally, Dr. Karagiozis testified that he did not specialize in psychiatry. Nonetheless, he testified that from a forensic perspective, there was no evidence, other than Grey’s own testimony, that Grey was under the influence of anything.
 

 The jury found Grey guilty of false imprisonment by using a person as a human shield. The district court subsequently sentenced Grey as a small habitual criminal under NRS 207.010(l)(a), even though the State failed to formally file an allegation of habitual criminality with the district court. This appeal followed.
 

 DISCUSSION
 

 Notice of expert rebuttal witness
 

 Grey argues that the Due Process Clause
 
 [1]
 
 requires the State to promptly notify a defendant of its intent to call expert rebuttal witnesses. Grey farther contends that to the extent that NRS 174.234 requires a defendant to disclose expert witnesses but does not re
 
 *117
 
 quire the State to reciprocate by disclosing expert rebuttal witnesses, the statute is unconstitutional.
 
 [2]
 
 In this, Grey relies on the United States Supreme Court’s decision in
 
 Wardius v.
 
 Oregon
 
 [3]
 
 for the proposition that due process requires discovery statutes in criminal cases to provide for reciprocal discovery. Grey alleges that he was prejudiced by the lack of disclosure because he was not able to investigate or prepare to cross-examine Dr. Karagiozis. We conclude that Grey’s constitutional challenge to NRS 174.234 has merit. Notwithstanding this conclusion, however, we also conclude that the State’s failure to provide notice of its intent to have Dr. Karagiozis testify at trial does not require reversal of Grey’s conviction because Grey has failed to demonstrate plain error by showing that his substantial rights were prejudiced.
 

 This court applies a de novo standard of review to constitutional challenges.
 
 [4]
 
 In defining the reciprocal disclosure required in criminal trials, NRS 174.234 refers to the “case in chief” of the defendant and the “case in chief” of the State. More specifically, NRS 174.234(2) provides:
 

 If the defendant will be tried for one or more offenses that are punishable as a gross misdemeanor or felony and a witness that a party intends to call during the case in chief of the State or during the case in chief of the defendant is expected to offer testimony as an expert witness, the party who intends to call that witness shall file and serve upon the opposing party, not less than 21 days before trial or at such other time as the court directs, a written notice containing:
 

 (a) A brief statement regarding the subject matter on which the expert witness is expected to testify and the substance of his testimony])]
 

 In interpreting this provision, this court explained in
 
 Floyd
 
 v.
 
 State,
 

 [5]
 

 Black’s Law Dictionary
 
 defines “case in chief” as “[t]hat part of a trial in which the party with the initial burden of proof presents his evidence after which he rests.” [NRS 174.234(2)] refer[s] to “the case in chief of the defendant” as well as “of the state,” even though a criminal defendant nor
 
 *118
 
 mally has no burden of proof. It is clear that the statutes use the term “case in chief” to refer to either party’s initial presentation of evidence,
 
 in contrast to either’s presentation of rebuttal
 
 evidence.
 
 [6]
 

 Thus, under our decision in
 
 Floyd,
 
 NRS 174.234 does not encompass rebuttal evidence.
 
 [7]
 
 Although
 
 Floyd’s
 
 construction of the term “case in chief,” as used in NRS 174.234(2), acknowledged that the Legislature had used the term to apply to “either party’s initial presentation of evidence, in contrast to either’s presentation of rebuttal evidence,” having revisited our decision in
 
 Floyd,
 
 we now conclude that it does not give sufficient consideration to the essential nature of the defendant’s case in a criminal trial.
 

 To explain, a defendant in a criminal case ordinarily has no burden of proof. Rather, in most circumstances, any evidence presented by a criminal defendant can be properly characterized as evidence “in rebuttal” to the State’s case in chief.
 
 [8]
 
 Thus, although NRS 174.234(2) does not identify such evidence as “rebuttal” evidence, it in fact requires the criminal defendant to reveal rebuttal experts while imposing no reciprocal duty on the State. Having revisited our decision in
 
 Floyd,
 
 we now conclude that to the extent that NRS 174.234(2) imposes such a nonreciprocal burden of disclosure on a criminal defendant, it is unconstitutional under the United States Constitution and the Nevada Constitution.
 

 In
 
 Wardius v. Oregon,
 
 the Court noted that “[although the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded, it does speak to the balance of forces between the accused and his accuser.”
 
 [9]
 
 The Court further held that “in the absence of a strong showing of state interests to the contrary, discovery must be a two-way street.”
 
 [10]
 
 Additionally, the Court held that:
 

 The State may not insist that trials be run as a “search for truth” so far as defense witnesses are concerned, while maintaining “poker game” secrecy for its own witnesses. It is fundamentally unfair to require a defendant to divulge the details of his own case while at the same time subjecting him to the
 
 *119
 
 hazard of surprise concerning refutation of the very pieces of evidence which he disclosed to the State.
 
 [11]
 

 Thus, the Court held that without a strong showing of State interests to the contrary, parties must be afforded reciprocal discovery. Similarly we have held that “[f] airness during trial is not one-sided and applies to both the defendant and the State.”
 
 [12]
 

 In
 
 Floyd,
 
 we also observed that “the need for and nature of rebuttal evidence is uncertain before trial.”
 
 [13]
 
 We now conclude, however, that this statement in
 
 Floyd
 
 disregards the reality that when a party has filed a notice of expert witnesses under NRS 174.234(2), the other party will not be uncertain about the need for and the nature of any expert rebuttal witness testimony A party who is required to provide notice of expert witnesses must also afford notice to the other party of the subject matter on which the expert witness is expected to testify, the curriculum vitae of the expert witness, and all reports made by or at the direction of the expert witness.
 
 [14]
 
 Parties who receive such notice will thus perceive the need for and will be able to disclose any expert witnesses that they may call in rebuttal. Thus, contrary to our reasoning in
 
 Floyd,
 
 when advance notice of the expected testimony of a party’s expert is provided prior to trial, the need for expert rebuttal witnesses to be presented by the other party is not uncertain. Under these circumstances, we perceive no reason why a party should not be required to disclose the list of expert rebuttal witnesses that the party intends to call to explain, repel, counteract, or disprove the expert testimony presented by the other party. We further perceive no strong State interest, and the State has pointed to none, that should preclude the State from providing reciprocal notice for any expert witness who it may call during rebuttal.
 

 In the instant appeal, the State has not sufficiently shown why its intent to have Dr. Karagiozis testify as an expert rebuttal witness was uncertain before trial. Consequently, under
 
 Wardius,
 
 we conclude that fundamental fairness and due process of law compelled such notice. More precisely, we hold that once a party in a criminal case receives notice of expert witnesses, the receiving party must provide reciprocal notice if that party intends to present expert rebuttal witnesses.
 
 [15]
 
 If a party fails to provide notice of an ex
 
 *120
 
 pert rebuttal witness, the court in its sound discretion may prohibit the expert witness from testifying; grant a continuance; order the party to provide a brief statement regarding the subject matter on which the expert rebuttal witness is to testify and the substance of his testimony, a copy of curriculum vitae of the expert rebuttal witness, and a copy of all reports made by or at the direction of the expert rebuttal witness; or enter such other order as it deems appropriate under the circumstances.
 

 Despite our conclusion that parties in criminal cases are constitutionally required to provide notice of expert rebuttal witnesses, we further conclude that the State’s failure to do so in the proceedings below does not constitute reversible error.
 

 “Failure to object below generally precludes review by this court; however, we may address plain error and constitutional error
 
 sua sponte.”
 

 [16]
 

 Grey did not object to Dr. Karagiozis as an expert rebuttal witness on the ground of inadequate notice; rather, Grey objected on the ground that Dr. Karagiozis was not qualified to testify on involuntary intoxication.
 
 [17]
 
 Additionally, the record on appeal reveals that Grey’s defense counsel never sought a continuance in order to prepare for Dr. Karagiozis’s testimony, which counsel could have requested. Further, although Grey complains that he was prejudiced because he was unable to adequately investigate or prepare to cross-examine Dr. Karagiozis, Grey has not shown specifically how a more thorough investigation or preparation would have made any difference in the case. Accordingly, we conclude that Grey has not demonstrated that the State’s lack of notice of its intent to have Dr. Karagiozis testify as an expert rebuttal witness affected his substantial rights.
 
 [18]
 
 Thus, we conclude that Grey has failed to demonstrate plain error warranting reversal.
 

 
 *121
 

 Sufficiency of the evidence
 

 Grey argues that the State failed to prove beyond a reasonable doubt that he intended to violate Fryer’s personal liberty or that he was using her as a human shield. We disagree.
 

 “ ‘The standard of review [when analyzing the sufficiency of evidence] in a criminal case is whether, after viewing the evidence in the light most favorable to the prosecution,
 
 any
 
 rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.’ ”
 
 [19]
 
 We conclude that in light of all of the evidence presented by the State at trial, including the video surveillance tapes, the testimony of the convenience store employee and the police officer, and Fryer’s grand jury testimony, the State presented sufficient evidence to prove beyond a reasonable doubt that Grey committed the crime of false imprisonment by using a person as a human shield.
 
 [20]
 

 Failure to draw blood or perform a urine test
 

 Grey argues that the State failed to gather exculpatory evidence when the medical staff at the detention center refused, allegedly on numerous occasions, to perform a blood draw or urine test. He contends that a blood draw and urine test were material to his case because these tests would have shown what type of narcotics or substances may have caused him to act the way he did on the day of the incident. He further argues that identifying the type of drug that may have been present in his system would have allowed Drs. Krelstein and Karagiozis to give more definite opinions as to his intoxication. Additionally, Grey argues that the State’s failure to perform a blood draw or urine test resulted from bad faith or gross negligence. Consequently, he contends that the charges against him should have been dismissed or, alternatively, the district court should have sanctioned the State by instructing the jury to presume that the tests would have been unfavorable to the State. We disagree.
 

 
 *122
 
 We conclude that Grey has failed to demonstrate that evidence from a blood or urine test would have been “material,”
 
 i.
 
 e., that there was reasonable probability of a different result if the evidence had been available.
 
 [21]
 
 Even if the evidence had shown a controlled substance in Grey’s system, it was not material because it would not have shown whether Grey voluntarily or involuntarily became intoxicated with the substance. Thus, the State did not fail to gather material evidence when the medical staff at the detention center did not perform a blood draw or urine test on Grey.
 

 Jury instruction as to involuntary intoxication
 

 Grey argues that because the jury instruction as to involuntary intoxication
 
 [22]
 
 did not contain any duty-to-acquit language, the jury instructions were incomplete. Even though Grey’s proposed jury instructions did not contain duty-to-acquit language, he contends that the district court should have sua sponte added duty-to-acquit language. Grey relies on our holdings in
 
 Carter
 
 v. State
 
 [23]
 
 and
 
 Crawford v. State.
 

 [24]
 

 We conclude that this alleged error does not warrant the reversal of Grey’s conviction.
 

 “The district court has broad discretion to settle jury instructions, and this court reviews the district court’s decision for an abuse of that discretion or judicial error.”
 
 [25]
 
 Because we decided
 
 Carter
 
 and
 
 Crawford
 
 after Grey’s trial had taken place, we must first determine whether our new rules of state law in those cases apply to the instant appeal. In
 
 Richmond
 
 v.
 
 State,
 
 we held that
 
 *123
 
 where a new rule of state law is not of constitutional force “retroactivity of [the] new rule is . . . only applicable when the issue has been preserved for appeal.”
 
 [26]
 

 Here, defense counsel failed to preserve the issue of the completeness of the involuntary intoxication instruction-for appeal. Therefore, we conclude that our holdings in
 
 Carter
 
 and
 
 Crawford
 
 do not apply to the instant appeal. Even assuming, however, that the district court erred by failing to instruct the jury as to its duty to acquit, we conclude based on our review of the entire record that any error was harmless beyond a reasonable doubt because a rational jury would have nonetheless found Grey guilty absent the error.
 
 [27]
 

 Habitual criminal under NRS 207.010
 

 Grey argues that the district court lacked jurisdiction to sentence him as a small habitual criminal under NRS 207.010(l)(a) because the State failed to file a notice of habitual criminality. We agree.
 

 Because Grey did not object to being sentenced as a habitual criminal on the grounds that the State never filed a habitual criminal allegation, we review this issue for plain error. Generally, the failure to clearly object on the record precludes appellate review.
 
 [28]
 
 ‘ ‘However, ‘this court has the discretion to address an error if it was plain and affected the defendant’s substantial rights.’ ”
 
 [29]
 
 Further, we note that an illegal sentence may be corrected at any time.
 
 [30]
 
 NRS 207.010(2) provides that “[i]t is within the discretion of the prosecuting attorney whether to include a count under this section in any information or file a notice of habitual criminality if an indictment is found.” That provision further gives the district court discretion to “dismiss a count under this section which is included in any indictment or information.” NRS 207.016(2) also provides that an allegation of habitual criminality may be “separately filed after conviction of the primary offense.’ ’
 

 Although the State claims that it filed the required notice of habitual criminality before the sentencing hearing, the record reveals that the notice was merely faxed to Grey’s counsel and was never formally filed with the district court. Additionally, the indictment did not contain an allegation that Grey was a habitual criminal.
 

 
 *124
 
 The relevant statutory scheme clearly premises the district court’s authority to impose a habitual criminal sentence on the State’s filing of an allegation of habitual criminality.
 
 [31]
 
 Therefore, we conclude that before a defendant may be sentenced as a habitual criminal under NRS 207.010, the State must duly file an allegation of habitual criminality. Thus, it was plain error for the district court to sentence Grey as a small habitual criminal when the State had not done so. Accordingly, we vacate Grey’s sentence as a small habitual criminal and remand this matter for a new sentencing hearing.
 

 CONCLUSION
 

 We conclude that the State’s failure to provide notice of its expert rebuttal witness to Grey was not plain error requiring reversal. To ensure fairness in future criminal cases, however, we hold that parties who intend to present expert rebuttal witnesses must provide notice of their expert rebuttal witnesses to the other party.
 

 As to Grey’s other assignments of error, we conclude that the State presented sufficient evidence to prove beyond a reasonable doubt that Grey committed the crime of false imprisonment by using a person as a human shield; the State did not fail to gather material evidence when the medical staff at the detention center did not perform a blood draw or urine test on Grey; and the district court’s failure to sua sponte instruct the jury as to its duty to acquit was not properly preserved for appeal and, in any event, was harmless beyond a reasonable doubt.
 

 Lastly, we conclude that it was plain error for the district court to sentence Grey as a habitual criminal under NRS 207.010 because the State had not properly filed a notice of habitual criminality and because the indictment contained in the record does not charge Grey as a habitual criminal.
 

 Accordingly, we affirm Grey’s judgment of conviction for false imprisonment by using a person as a human shield, but we vacate Grey’s sentence as a small habitual criminal and remand this matter for a new sentencing hearing.
 

 Gibbons, C. L, Maupin, Hardesty, Parraguirre, Cherry and Saitta, JL, concur.
 

 [1]
 

 U.S. Const. amend. XIV.
 

 [2]
 

 Grey points out that in civil cases, parties are required to disclose rebuttal witnesses before trial under NRCP 16.1.
 

 [3]
 

 412 U.S. 470, 474-75 (1973).
 

 [4]
 

 Callie
 
 v.
 
 Bowling,
 
 123 Nev. 181, 183, 160 P.3d 878, 879 (2007) (citing
 
 Rico v. Rodriguez,
 
 121 Nev. 695, 702, 120 P.3d 812, 817 (2005)).
 

 [5]
 

 118 Nev. 156, 168, 42 P.3d 249, 257-58 (2002).
 

 [6]
 

 Id.
 
 at 168, 42 P.3d at 257 (footnotes omitted) (emphasis added) (quoting
 
 Black’s Law Dictionary
 
 216 (6th ed. 1990)).
 

 [7]
 

 In contrast, NRS 174.233 does require the disclosure of certain rebuttal alibi witnesses,
 
 i.e.,
 
 the prosecuting attorney must disclose a list of witnesses the State intends to call in rebuttal to discredit the defendant’s alibi.
 

 [8]
 

 There are some instances when an initial burden of proof may fall upon a criminal defendant. Our holding today requiring reciprocal discovery of expert witnesses applies regardless of which party bears the initial burden.
 

 [9]
 

 412 U.S. 470, 474 (1973) (citation omitted).
 

 [10]
 

 Id.
 
 at 475.
 

 [11]
 

 Id.
 
 at 475-76 (footnote omitted).
 

 [12]
 

 Sampson v. State,
 
 121 Nev. 820, 828, 122 P.3d 1255, 1260 (2005).
 

 [13]
 

 Floyd
 
 v.
 
 State,
 
 118 Nev. 156, 168, 42 P.3d 249, 257 (2002).
 

 [14]
 

 NRS 174.234(2).
 

 [15]
 

 In reaching our decision, we note that the reciprocal discovery rule for expert rebuttal witnesses we announce today shall not compel a defendant to dis
 
 *120
 
 close incriminating evidence in violation of the Fifth Amendment,
 
 e.g.,
 
 incriminating reports or physical examinations that an expert witness may have relied upon in forming an opinion.
 
 See Binegar v. District Court,
 
 112 Nev. 544, 549-51, 915 P.2d 889, 893-94 (1996).
 

 [16]
 

 Sterling v. State,
 
 108 Nev. 391, 394, 834 P.2d 400, 402 (1992).
 

 [17]
 

 Grey maintains on appeal that the district court erred in allowing Dr. Karagiozis to render an expert opinion as to whether Grey was involuntarily intoxicated. We conclude that this argument is without merit.
 
 See
 
 NRS 50.275;
 
 Banks v. Sunrise Hospital,
 
 120 Nev. 822, 833, 102 P.3d 52, 60 (2004) (“Because the admission of expert testimony is in the sound discretion of the district court, we will not reverse the district court’s decision absent an abuse of discretion.”).
 

 [18]
 

 See Anderson v. State,
 
 121 Nev. 511, 516, 118 P.3d 184, 187 (2005) (“‘In conducting plain error review, we must examine whether there was “error,” whether the error was “plain” or clear, and whether the error af
 
 *121
 
 fected the defendant’s substantial rights.’ Thus, ‘the burden is on the defendant to show actual prejudice or a miscarriage of justice.”’ (quoting
 
 Green
 
 v.
 
 State,
 
 119 Nev. 542, 545, 80 P.3d 93, 95 (2003))).
 

 [19]
 

 Nolan v. State,
 
 122 Nev. 363, 377, 132 P.3d 564, 573 (2006) (quoting
 
 McNair
 
 v.
 
 State,
 
 108 Nev. 53, 56, 825 P.2d 571, 573 (1992) (alteration in original)).
 

 [20]
 

 NRS 200.460(1) (“False imprisonment is an unlawful violation of the personal liberty of another, and consists in confinement or detention without sufficient legal authority.”); NRS 200.460(5) (providing that false imprisonment is a category B felony if it is “committed by using the person so imprisoned as a shield or to avoid arrest”).
 

 [21]
 

 See Randolph
 
 v.
 
 State,
 
 117 Nev. 970, 987, 36 P.3d 424, 435 (2001);
 
 Daniels
 
 v.
 
 State,
 
 114 Nev. 261, 267, 956 P.2d 111, 115 (1998).
 

 [22]
 

 Jury Instruction Number 12 read:
 

 Involuntary Intoxication becomes a defense to a crime only if the defense proves three elements by a preponderance of the evidence.
 

 First, the defendant must show that it is more likely than not that (1) he was compelled to take the intoxicating substance against his will either through force, duress, fraud, or contrivance; (2) his intoxication was caused by the intoxicating substance in question and not by some other intoxicant or mixture thereof; and (3) he was made so mentally deficient by reason of involuntary intoxication, and that he could not know or understand the nature and capacity of his act, or that he could not appreciate the wrongfulness of his act.
 

 If the defendant proves the foregoing three elements of the defense by a preponderance of the evidence, the burden shifts to the State to disprove the defense beyond a reasonable doubt.
 

 [23]
 

 121 Nev. 759, 121 P.3d 592 (2005).
 

 [24]
 

 121 Nev. 744, 121 P.3d 582 (2005).
 

 [25]
 

 Id.
 
 at 748, 121 P.3d at 585.
 

 [26]
 

 118 Nev. 924, 929, 59 P.3d 1249, 1252 (2002).
 

 [27]
 

 See Neder v. United States,
 
 527 U.S. 1, 18 (1999).
 

 [28]
 

 Green v. State,
 
 119 Nev. 542, 545, 80 P.3d 93, 95 (2003).
 

 [29]
 

 Id.
 
 (quoting
 
 Gallego v. State,
 
 117 Nev. 348, 365, 23 P.3d 227, 239 (2001)).
 

 [30]
 

 NRS 176.555 (“The court may correct an illegal sentence at any time.”).
 

 [31]
 

 See
 
 NRS 176.033; NRS 193.130;
 
 see also Villanueva v. State,
 
 117 Nev. 664, 668, 27 P.3d 443, 445-46 (2001) (holding “that it is the legislature’s function to set penalties, a function [that our court] will not invade absent constitutional problems”).