136 Nev., Advance Opinion 22

IN THE SUPREME COURT OF THE STATE OF NEVADA

VERNON NEWSON, JR.,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

No. 75932

**FILED**

APR 30 2020

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY_____
CHIEF DEPUTY CLERK



Petition for en banc reconsideration of a panel opinion in an appeal from a judgment of conviction, pursuant to a jury verdict, of first-degree murder with use of a deadly weapon, two counts of child abuse, neglect or endangerment, and ownership or possession of a firearm by a prohibited person. Eighth Judicial District Court, Clark County; Douglas W. Herndon, Judge.

*Petition granted; affirmed in part, reversed in part, and remanded.*

Darin F. Imlay, Public Defender, and William M. Waters, Chief Deputy Public Defender, Clark County,
for Appellant.

Aaron D. Ford, Attorney General, Carson City; Steven B. Wolfson, District Attorney, and Alexander G. Chen, Chief Deputy District Attorney, Clark County,
for Respondent.

BEFORE THE COURT EN BANC.

*OPINION*

By the Court, SILVER, J.:

Vernon Newson and Anshanette McNeil were driving in a rented SUV on a freeway on-ramp when Newson turned and shot Anshanette, who was seated in the backseat next to the couple's infant son and Anshanette's toddler. Newson pulled the vehicle over to the side of the road and Anshanette either fled or was pulled from the vehicle. Newson shot her additional times before driving off, leaving her behind. Newson drove the children to Anshanette's friend, reportedly telling her that Anshanette had "pushed me too far to where I can't take it no more." Newson fled to California, where he was apprehended. The State charged Newson with open murder. Although Newson did not testify at trial, defense counsel conceded in closing argument that Newson shot Anshanette, arguing Newson did so in a sudden heat of passion and that the killing was not premeditated. The district court declined to instruct the jury on voluntary manslaughter, concluding the evidence did not establish that offense. The jury convicted Newson of first-degree murder, two counts of child abuse, neglect or endangerment, and ownership or possession of a firearm by a prohibited person.

The primary issues raised on appeal are whether the district court abused its discretion by declining to instruct the jury on voluntary manslaughter and whether sufficient evidence existed to uphold Newson's two child abuse, neglect or endangerment convictions. On October 10, 2019, a panel of this court issued an opinion in this case, reversing the first-degree murder conviction because the district court erred by failing to instruct the jury on voluntary manslaughter but affirming the remaining convictions.

 

Newson petitioned for en banc reconsideration.[1] Having considered the petition, we conclude that en banc reconsideration is warranted to clarify the decision regarding the child abuse, neglect or endangerment convictions. *See* NRAP 40A(a). We therefore grant Newson's petition, withdraw the panel's opinion, and issue this opinion in place of the panel's withdrawn opinion.

We conclude the district court abused its discretion by declining to instruct the jury on voluntary manslaughter, as the circumstantial evidence suggested the killing occurred in a sudden heat of passion upon provocation. We reiterate that district courts must instruct juries on the defendant's theory of the case where there is any evidence, no matter how weak, to support it. We therefore reverse the first-degree murder conviction and remand for a new trial on that charge. We reject Newson's remaining assertions of error and therefore affirm the judgment of conviction as to the other charges.

## I.

Late one night, witnesses driving in Las Vegas on Lamb Boulevard near the I-15 heard rapid gunfire coming from a nearby freeway on-ramp. Looking in the direction of the gunfire, they observed an SUV on the on-ramp and thought they heard more than one car door slam before the SUV sped off. Persons who arrived at the scene shortly thereafter saw a badly injured woman lying on the road. She had been shot seven times: through her cheek and neck, chin and neck, chest, forearm, upper arm, and twice in the back. At least one of the shots—the one that entered through

---

[1]We previously denied the State's petition for en banc reconsideration.

the victim's right cheek, exited her right neck and reentered her right upper chest—was fired at a close range of six inches to two feet. Three of the shots were independently fatal, and the woman passed away shortly after the shooting. The victim had no shoes, and a cell phone damaged by a gunshot was on the ground a few feet away. Responding officers recovered six spent cartridges from the area, and the pavement showed evidence of fresh dents from bullet strikes. The toxicology report later showed that the victim had methamphetamine and its metabolite, and hydrocodone and its metabolite, in her system at the time of death.

Meanwhile, Zarharia Marshall was waiting at her residence for Anshanette McNeil to drop off Anshanette's infant son. Zarharia and Anshanette were close friends, and Zarharia often babysat for Anshanette. But Anshanette never arrived. Instead, Vernon Newson, Anshanette's boyfriend of three years and the infant's father, arrived in Anshanette's rental SUV to drop off the infant and, to Zarharia's surprise, Anshanette's two-year-old son.

As Newson exited the vehicle, bullets fell from his lap. Newson was acting frantic, irritated, and nervous. He struggled to extricate the infant's car seat from the SUV and, according to Zarharia, ordered the crying child "to shut up." Newson handed the car seat with the infant inside to Zarharia before retrieving a baby swing and diaper bag from the trunk. Newson went around the SUV to let the two-year-old out. The toddler looked frightened, and when Zarharia asked him whether he was staying with her and whether he was going to cry, the toddler looked at her without answering and then ran into the house. Newson followed Zarharia and the children inside and kissed his infant son before asking to speak with

Zarharia. Zarharia followed Newson outside and watched him pick up a bullet from the driveway and place it in a gun magazine. Zarharia also noticed Anshanette's shoes and purse in the back seat of the SUV. Zarharia testified that Newson retrieved the purse from the SUV, handed it to her, and asked her to tell his son that he always loved him. Zarharia asked Newson what had happened, and she testified that he responded, "you know, just know that mother fucker's pushed me too far to where I can't take it no more." Newson drove off.

Zarharia retrieved several of the bullets that had fallen onto her driveway and tried to call Anshanette, who did not answer. Zarharia took the infant out of his car seat to change his diaper and realized he had blood on his pants and that there was blood in the car seat as well. She called Anshanette's mother, who in turn called the police. Based on her description, detectives were able to identify Anshanette as the shooting victim.

Police located and arrested Newson more than a week later in California. Newson's watch had Anshanette's blood on it, and he was carrying bullets of the same caliber and make as those used in the shooting. Police did not recover the murder weapon but did recover the SUV, which had been abandoned and still contained bloody clothing, a pair of flip-flops, a car seat, spent cartridges, and other items. Anshanette's blood was on the driver's side rear seat, seatbelt, door, and door handle, as well as on the steering wheel. Detectives also recovered six spent cartridges and one unfired round from the SUV, and those cartridges matched the cartridges recovered at the crime scene. The SUV had three bullet holes in the back seat, and there were bullet fragments in the vehicle.

 

The State charged Newson with murder with use of a deadly weapon, two counts of child abuse, neglect or endangerment, and ownership or possession of a firearm by a prohibited person. At trial, the State's theory of the case was that Newson was driving the SUV when he pulled the vehicle over to the side of the road, turned around, and shot Anshanette, who bled on the infant. Newson then exited the SUV, pulled Anshanette from the vehicle and threw her onto the road, stood over her, and shot her several additional times before climbing back into the SUV and driving off.

Newson did not testify at trial. However, Newson's counsel conceded that the evidence showed Newson shot Anshanette, but argued that the State's evidence fell short of proving first-degree murder. Newson's counsel contended that the circumstantial evidence showed that Newson became angry while driving and shot Anshanette while his passions were inflamed. In support, Newson's counsel pointed to evidence surrounding the shooting and testimony that the couple argued constantly, including while driving. He also pointed to evidence that Anshanette had high levels of methamphetamine in her system at the time of the shooting, which an expert witness at trial agreed may have caused her to become irrational or aggressive. Newson's counsel further argued the physical evidence did not show that Newson ever exited the SUV.

Pertinent here, Newson wished to have the jury instructed on voluntary manslaughter, and his counsel proffered instructions to that end. The State argued that the instructions were not warranted because there was no evidence of any particular provocation that incited the killing. Newson's counsel countered that circumstantial evidence justified the instructions and that the State's provocation threshold would force Newson

to testify and waive his Fifth Amendment right against self-incrimination. The district court agreed with the State that the evidence did not establish sufficient context to warrant the instructions. The court thereafter instructed the jury only as to first- and second-degree murder.

The jury convicted Newson of first-degree murder with use of a deadly weapon and the remaining charges. The district court sentenced him to an aggregate sentence of life with parole eligibility after 384 months. Newson appeals.

## II.

Newson alleges error only as to the convictions for first-degree murder and child abuse, neglect and endangerment. We first consider whether the district court abused its discretion by refusing to instruct the jury on voluntary manslaughter.[2] We thereafter examine whether the State failed to adequately inform Newson of the child abuse, neglect or endangerment charges or prove the necessary elements of those charges.

---

[2]Newson also contends the district court erred by declining to give his proffered instruction on two reasonable interpretations of the evidence and that the district court gave an inaccurate flight instruction. The district court was not required to give the proffered two reasonable interpretations of the evidence instruction because the jury was properly instructed on reasonable doubt. *See, e.g., Bails v. State*, 92 Nev. 95, 96-98, 545 P.2d 1155, 1155-56 (1976). We do not address the flight instruction, as Newson did not raise his appellate arguments below. *See Grey v. State*, 124 Nev. 110, 120, 178 P.3d 154, 161 (2008) (holding that the defendant must object at trial to the same grounds he or she asserts on appeal); *Davis v. State*, 107 Nev. 600, 606, 817 P.2d 1169, 1173 (1991) (holding that this court need not consider arguments raised on appeal that were not presented to the district court in the first instance), *overruled on other grounds by Means v. State*, 120 Nev. 1001, 103 P.3d 25 (2004).

 

## A.

Newson first contends the district court erred by refusing to instruct the jury on his defense theory of voluntary manslaughter,[3] where that theory was supported by Zarharia's testimony regarding Newson's apparent distress and statements made shortly after the crime, as well as by the physical evidence. The State counters that the district court properly refused to instruct the jury on voluntary manslaughter because the evidence did not establish a provocation.

"The district court has broad discretion to settle jury instructions, and this court reviews the district court's decision for an abuse of that discretion or judicial error." *Crawford v. State*, 121 Nev. 744, 748, 121 P.3d 582, 585 (2005). The failure to instruct the jury on a defendant's theory of the case that is supported by the evidence warrants reversal unless the error was harmless. *See Cortinas v. State*, 124 Nev. 1013, 1023-25, 195 P.3d 315, 322-23 (2008) (discussing when instructional error may be reviewed for harmlessness).

Existing caselaw treats voluntary manslaughter as a lesser-included offense of murder. *Williams v. State*, 99 Nev. 530, 531, 665 P.2d 260, 261 (1983); *see also Collins v. State*, 133 Nev. 717, 727 & n.1, 405 P.3d 657, 666 & n.1 (2017). Voluntary manslaughter involves "a serious and highly provoking injury inflicted upon the person killing, sufficient to excite an irresistible passion in a reasonable person, or an attempt by the person killed to commit a serious personal injury on the person killing." NRS

---

[3]Because the parties did not brief the issue of whether the proffered voluntary manslaughter instructions were correct statements of law, we do not address it.

 

200.050(1). Moreover, the killing must result from a sudden, violent, irresistible passion that was "caused by a provocation apparently sufficient to make the passion irresistible." NRS 200.040(2); *see also* NRS 200.060.

We have frequently addressed the circumstances in which a trial judge should give voluntary manslaughter instructions at the request of a defendant charged with murder. *See, e.g., Collins*, 133 Nev. at 727-28, 405 P.3d at 666-67; *Williams*, 99 Nev. at 531, 665 P.2d at 261. In the seminal case of *Williams v. State*, the defendant claimed the killing happened in the heat of passion after he and the victim engaged in a fistfight and the victim threw the defendant to the floor, but the trial court refused to give the defendant's proffered voluntary manslaughter instruction. 99 Nev. at 531-32, 665 P.2d at 261-62. In concluding that the district court erred, we reiterated that a criminal defendant "is entitled, upon request, to a jury instruction on his or her theory of the case, so long as there is some evidence, no matter how weak or incredible, to support it." *Id.* at 531, 665 P.2d at 261. Applying that rule, we explained that the defendant's theory of the altercation that led to the killing could support a voluntary manslaughter conviction because the victim's actions during the fight could be viewed as an attempt to seriously injure the defendant, providing sufficient provocation under NRS 200.050. *Id.* at 532, 665 P.2d at 261-62.

Conversely, in *Collins v. State*, we upheld the district court's decision not to give a voluntary manslaughter instruction where *no* evidence supported that charge. 133 Nev. at 728-29, 405 P.3d at 666. In that case, circumstantial evidence linked the defendant to the killing, including the defendant's and the victim's prior history, cell phone records

on the day the victim disappeared, the defendant's possession of the victim's jewelry, the victim's blood and acrylic nail in the defendant's home, and the victim's blood in the trunk of an abandoned car. *Id.* at 718-19, 405 P.3d at 660-61. The defendant requested a voluntary manslaughter instruction based upon his remark to a third party that the defendant thought he should delete text messages between himself and the victim for fear that the police might use those messages to link him to the victim's disappearance. *Id.* at 728, 405 P.3d at 667. We concluded that "[t]he cryptic reference to a text-message exchange" in no way "suggest[ed] the irresistible heat of passion or extreme provocation required for voluntary manslaughter," warning that to give a lesser-included offense instruction where no facts supported the lesser offense could lead a jury to return a compromise verdict unsupported by the evidence. *Id.*

Here, it is undisputed that Newson killed Anshanette. The sole question is whether the evidence warranted a voluntary manslaughter instruction where there was no direct evidence of the events immediately preceding the killing and the defendant chose to invoke his constitutional Fifth Amendment right to remain silent. In declining to instruct the jury on voluntary manslaughter, the district court specifically concluded that Newson's statement, according to Zarharia—that Anshanette had "pushed [him] too far to where [he] can't take it no more"—demonstrated neither a sudden passion nor sufficient provocation for voluntary manslaughter because the statement lacked context as to when Newson was "pushed . . . too far." We disagree that this statement lacked adequate context under these circumstances and further disagree that the evidence taken as a whole does not support a voluntary manslaughter charge.

 

The State was not prohibited from arguing circumstantial evidence as a whole showed first-degree murder. Yet, Newson's counsel was prohibited from arguing Newson's theory regarding what crime the evidence showed. The record here shows abundant circumstantial evidence suggesting the killing was not planned and instead occurred in a sudden heat of passion. The circumstances of the killing itself suggest a sudden heat of passion. The shooting occurred in a rented SUV on a freeway on-ramp in a busy location, and witnesses heard rapid gunfire and at least one car door slam. Because Newson was in the driver's seat when he began shooting, he would have had to point the gun directly behind him—quite possibly while still driving the SUV—in order to fire those first few shots at Anshanette. Moreover, two young children were present in the car, and the one next to Anshanette was Newson's own baby. Either child could have easily been hit by a stray bullet or casing, to say nothing of the danger presented by two adults fighting in a moving vehicle. Meanwhile, Anshanette's friend, Zarharia, was expecting Anshanette to arrive at any moment to drop off the infant and would be sure to miss Anshanette when she did not arrive with Newson. All told, it is difficult to imagine a more unlikely setting for a deliberate, planned killing.

Newson's behavior and demeanor immediately after the killing further suggest that it may have happened in the heat of passion. Notably, Zarharia testified that Newson was very agitated when he arrived at her residence to drop off the children. Bullets fell from his lap as he stepped out of the SUV. Anshanette's purse and shoes were still in the back seat, and yet Newson made no attempt to hide these from Zarharia, and in fact handed Zarharia Anshanette's purse. He also handed Zarharia the blood-

SUPREME COURT
OF
NEVADA

(O) 1947A

stained baby carrier, and proceeded to retrieve and load a bullet into the gun magazine while Zarharia looked on. He also openly blamed Anshanette for whatever had happened. These facts support the inference that Newson was still overwrought when he reached Zarharia's and that he was not taking any measures to conceal the evidence of the killing, such that a juror could infer that Newson had reacted in the heat of the moment when he killed Anshanette and had not planned to kill her.

Circumstantial evidence also suggests sufficient provocation. According to Zarharia, when she asked Newson what had happened, he responded that Anshanette had "pushed [him] too far to where [he] can't take it no more." This statement, viewed in light of the other evidence, supports an inference that Anshanette may have provoked Newson while they were driving to Zarharia's. The testimony that the couple fought frequently while driving, and the evidence that Anshanette was under the influence of methamphetamine along with the coroner's testimony that these types of illicit drugs can cause a person to become irrational or aggressive, further supports Newson's argument that the couple may have been fighting when Newson shot Anshanette. The physical evidence could provide some additional support for that view. At least one bullet—the shot that entered through Anshanette's right cheek, exited her right neck, and reentered her right upper chest—was fired at a very close range, possibly as close as six inches, which could suggest that Anshanette had moved out of her seat and had her upper body near Newson when he fired that shot. Newson's demeanor when he arrived at Zarharia's suggests that he had recently been enraged. Finally, Newson's statement came in response to Zarharia's question of "what happened," which implies Newson meant he

(O) 1947A

was "pushed . . . too far" and simultaneously could not "take [Anshanette's pushing] no more" while driving to Zarharia's.

While this evidence is all circumstantial, likewise, so is the State's theory of how the killing occurred. We remind district courts "that a defendant is entitled to a jury instruction on his theory of the case, so long as there is evidence to support it, *regardless of whether the evidence is weak, inconsistent, believable, or incredible.*" *Hoagland v. State*, 126 Nev. 381, 386, 240 P.3d 1043, 1047 (2010) (emphasis added). We conclude that the evidence could support a voluntary manslaughter verdict and the district court was therefore required to instruct the jury on voluntary manslaughter. Moreover, the State's case for first-degree murder was not strong, and we therefore are not convinced that the failure to instruct the jury on Newson's theory of the case was harmless beyond a reasonable doubt. Accordingly, we reverse the judgment of conviction on first-degree murder and remand for a new trial on the murder charge. In light of our decision, we need not address Newson's remaining assertions of error as to that charge.

B.

Newson next contends the State violated his Sixth Amendment rights by failing to inform him of the specific child abuse or neglect charges against him and failed to prove abuse or neglect at trial. Newson did not raise the first argument below, and we decline to address it. *See Davis v. State*, 107 Nev. 600, 606, 817 P.2d 1169, 1173 (1991) (holding that this court need not consider arguments raised on appeal that were not presented to the district court in the first instance), *overruled on other grounds by Means v. State*, 120 Nev. 1001, 103 P.3d 25 (2004). We therefore only consider

 

whether the evidence supported the jury's verdict finding Newson guilty of two counts of child abuse, neglect or endangerment.

Evidence is sufficient to support a verdict if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Higgs v. State*, 126 Nev. 1, 11, 222 P.3d 648, 654 (2010) (internal quotations omitted). We conclude sufficient evidence was presented for a rational juror to find Newson guilty under NRS 200.508(1) based on negligent treatment or maltreatment of a child as defined by NRS 432B.140.[4]

NRS 200.508(1) makes it a crime to willfully cause a child "to suffer unjustifiable physical pain or mental suffering as a result of abuse or neglect *or to be placed in a situation where the child may suffer physical pain or mental suffering as the result of abuse or neglect.*" (Emphasis added.) In *Clay v. Eighth Judicial District Court,* we explained that subsection 1 sets forth two "alternative means of committing the offense." 129 Nev. 445, 451, 305 P.3d 898, 902 (2013). Under the first, the State must "prove that (1) a person willfully caused (2) a child who is less than 18 years of age (3) to suffer unjustifiable physical pain or mental suffering (4) as a result of abuse or neglect." *Id.* at 451-52, 305 P.3d at 902. Alternatively, the State must "prove that (1) a person willfully caused (2) a child who is less than 18 years of age (3) to *be placed in a situation where the child may suffer physical pain or mental suffering (4) as the result of abuse or neglect.*" *Id.* at 452, 305 P.3d at 902-03 (emphasis added).

---

[4]In light of our decision, we do not address the remaining types of abuse or neglect outlined in NRS 200.508(4)(a).

 

Under either alternative, the fourth element is "abuse or neglect." NRS 200.508(4)(a) defines "abuse or neglect," in relevant part, as "maltreatment of a child under the age of 18 years, as set forth in . . . [NRS] 432B.140[,] . . . under circumstances which indicate that the child's health or welfare is harmed or threatened with harm." In turn, NRS 432B.140, in relevant part, provides that "[n]egligent treatment or maltreatment" occurs where "a child has been subjected to harmful behavior that is terrorizing, degrading, painful or emotionally traumatic."[5]

Here, the State charged Newson with two counts of child abuse, neglect or endangerment under NRS 200.508(1) for putting Anshanette's two children "in a situation where the child *may suffer* physical pain or mental suffering as a result of abuse or neglect, by shooting at or into the body of ANSHANETTE MCNEIL, . . . while [each child] was seated next to and in close proximity to ANSHANETTE." (Emphasis added.) The "may suffer" language communicated that the State was proceeding under the second theory of liability set forth in NRS 200.508(1). And the jury was instructed that negligent treatment or maltreatment was a type of "abuse or neglect" at issue.

The jury could reasonably infer from the evidence presented that Newson placed the children in a situation where they might suffer physical pain or mental suffering as the result of negligent treatment or maltreatment. *Clay*, 129 Nev. at 454, 305 P.3d at 904 (explaining that liability can attach under NRS 200.508(1) even in the absence of physical

---

[5]This language was added to NRS 432B.140 in 2015, after *Clay* was decided, and it took effect before Newson committed the charged offenses. 2015 Nev. Stat., ch. 399, §§ 26, 27(3), at 2245.

Supreme Court
OF
Nevada

(O) 1947A

15

pain or mental suffering "if the defendant placed the child in a situation where the child *may* suffer physical pain or mental suffering as the result of the negligent treatment or maltreatment"). In particular, by shooting Anshanette in a moving car while she was seated next to the two children, Newson subjected the children to "harmful behavior" that was "terrorizing" or "emotionally traumatic" and therefore amounted to negligent treatment or maltreatment. NRS 432B.140. And the circumstances surrounding that negligent treatment or maltreatment placed the children in danger of physical harm for purposes of the second theory in NRS 200.508(1) and the definition of "abuse or neglect" in NRS 200.508(4)(a). Unlike NRS 200.508(2), which this court also addressed in *Clay*, *see* 129 Nev. at 452-53, 305 P.3d at 903, NRS 200.508(1) imposes no requirement that Newson be responsible for the children, nor does NRS 432B.140 impose a responsibility requirement for the form of negligent treatment or maltreatment at issue here.[6]

Even assuming, arguendo, that NRS 432B.140 requires that the defendant have been responsible for the child's welfare regardless of the form of negligent treatment or maltreatment at issue, the jury could reasonably infer that Newson was responsible for both children's welfare at the time of the shooting. Specifically, the evidence established that Newson was the baby's father; that Newson, although not the older child's father, had been in a long-term dating relationship with Anshanette, the child's

---

[6]The structure of NRS 432B.140 ties the responsibility requirement to the last type of neglect or maltreatment listed in that statute—when the child "lacks the subsistence, education, shelter, medical care or other care necessary for the well-being of the child."



mother; and that Newson was driving the car with the children inside at the time he shot into the backseat. *See* NRS 432B.130 (addressing the meaning of the phrase "[p]ersons responsible for child's welfare"); *Clay*, 129 Nev. at 454, 305 P.3d at 904 (providing an example of liability under the second theory in NRS 200.508(1) based on negligent treatment or maltreatment as defined in NRS 432B.140 where an intoxicated driver places a child in the car and drives without getting into an accident). Accordingly, a rational juror could find Newson guilty beyond a reasonable doubt of two counts of child abuse, neglect or endangerment in violation of NRS 200.508(1).[7]

### III.

A district court must instruct the jury on voluntary manslaughter when requested by the defense so long as it is supported by some evidence, even if that evidence is circumstantial. We conclude that some evidence in this case suggests the shooting occurred in the heat of passion, including the physical evidence, the circumstances surrounding the shooting, the evidence regarding the couple's relationship and the victim's drug use, and the evidence regarding Newson's demeanor and emotional state. The district court therefore erred by declining to instruct the jury on voluntary manslaughter. Because we are not convinced that the error was harmless considering all of the evidence presented, we reverse the

---

[7]We disagree with Newson's argument that cumulative error warrants reversal. *See United States v. Sager*, 227 F.3d 1138, 1149 (9th Cir. 2000) ("One error is not cumulative error."); *see also Valdez v. State*, 124 Nev. 1172, 1195, 196 P.3d 465, 481 (2008) (addressing the test for cumulative error).

 

judgment of conviction as to the murder charge and remand for a new trial on that charge. But, we conclude that sufficient evidence supports the remaining convictions and that none of the other claims of error warrant relief. We therefore affirm the judgment of conviction as to the remaining charges.

_____, J.
Silver

We concur:

_____, C.J.
Pickering

_____, J.
Gibbons

_____, J.
Hardesty

_____, J.
Parraguirre

_____, J.
Stiglich

_____, J.
Cadish

SUPREME COURT
OF
NEVADA

(O) 1947A

18